## SMITH *v.* MOODY and Others.

·NEGROES.—CITIZENSHIP.—A free man of color born within the *United States* is a citizen of the *United States,* and as such is entitled to become a citizen of any one of the several states, by becoming a resident thereof.

SAME.—RIGHT TO VOTE AND HOLD OFFICE.—The right to vote and the legal capacity to hold office are not essential to the character of a citizen. Allegiance on the part of the person, and the duty of protection on the part of the government, constitute citizenship under the constitution.

BLACK LAWS.—THIRTEENTH ARTICLE.—The thirteenth article of the constitution of *Indiana,* which prohibits any negro or mulatto from coming into the State, and declares void all contracts made with such as shall come into the State contrary to its provisions, and the act of *June* 18, 1852, entitled "an act to enforce the 13th article of the constitution," (1 G. & H., p. 443,) are repugnant to the constitution of the *United States.*

APPEAL from the *Marion* Common Pleas.

GREGORY, C. J.—*Smith* sued *Moody* and another in the court below upon a promissory note.

The defendants answered: "That the plaintiff is a negro, or person of *African* descent, and that prior to *November* 1, 1851, he was a non-resident of the State of *Indiana,* and came into and settled in and became an inhabitant of said State since that time; that defendants are citizens of the State of *Indiana,* and were at the time of making the contract sued on, and that said contract was made in said State. Wherefore, the defendants say that the plaintiff cannot maintain this suit, and that said contract is void."

A demurrer to the answer was overruled. The plaintiff then filed the following reply:

"For reply to the answer of defendants, plaintiff states that it is true he is a negro, or person of *African* descent, but he says he was born free, within the jurisdiction and allegiance of the *United States,* to-wit: in the State of *Ohio,* and that he was by birth a citizen of said State, and of the *United States of America,* and that he resided in the State of *Ohio* from his birth till his removal into the State of *Indiana.*"

A demurrer to the reply was sustained, and final judgment rendered against the plaintiff, who prosecutes this appeal. The ruling of the court below upon the demurrers is assigned for error.

The constitution of *Indiana* contains the following provisions:

## ARTICLE XIII.

### NEGROES AND MULATTOES.

"Sec. 1. No negro or mulatto shall come into or settle in the State after the adoption of this constitution.

"Sec. 2. All contracts made with any negro or mulatto coming into the State contrary to the foregoing section shall be void; and any person who shall employ such negro or mulatto, or otherwise encourage him to remain in the State, shall be fined in any sum not less than ten dollars nor more than five hundred dollars."

The legislature of *Indiana* passed "an act to enforce the thirteenth article of the constitution," which was approved *June* 18, 1852, and is as follows:

"Sec. 1. Be it enacted by the General Assembly of the State of *Indiana*, that it shall not be lawful for any negro or mulatto to come into, settle in, or become an inhabitant of the State.

"Sec. 6. All contracts made with negroes or mulattoes who shall have come into the State of *Indiana* subsequent to the 1st day of *November*, A. D. 1851, are hereby declared null and void.

"Sec. 7. Any person who shall employ a negro or mulatto who shall have come into the State of *Indiana* subsequent to the 31st day of *October*, in the year one thousand eight hundred and fifty-one, or who shall hereafter come into said State, or who shall encourage such negro or mulatto to remain in the State, shall be fined in any sum not less than ten dollars nor more than five hundred dollars.

"Sec. 9. Any negro or mulatto who shall come into or settle in this State contrary to, and in violation of, the

provisions of the constitution, and of the first section of this act, shall be fined in any sum not less than ten nor more than five hundred dollars." 1 G. & H. 443.

It is urged, on behalf of the appellant, that this article of the constitution of *Indiana*, and this act of the legislature to enforce the same, are in direct conflict with the constitution of the *United States*, and are therefore void.

The constitution of the *United States* provides that, "The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." Art 4, sec. 2.

Judge STORY says of this section, that "It is plain and simple in its language; and its object is not easily to be mistaken. Connected with the exclusive power of naturalization in the national government, it puts at rest many of the difficulties which affected the construction of the article of the confederation. It is obvious, that if the citizens of each state were to be deemed aliens from each other, they could not take or hold real estate, or other privileges, except as other aliens. The intention of this clause was to confer on them, if one may so say, a general citizenship; and to communicate all the privileges and immunities which the citizens of the same state would be entitled to under the like circumstances." Story on the Con., § 1806. One of the privileges and immunities arising from this general citizenship is the right to become a citizen of any one of the several states, by becoming a resident thereof.

In *Gassies* v. *Ballon*, 6 Peters 761, MARSHALL, C. J., in delivering the opinion of the court, says: "The defendant in error is alleged in the proceedings to be a citizen of the *United States*, naturalized in *Louisiana*, and residing there. This is equivalent to an averment that he is a citizen of that state. A citizen of the *United States* residing in any state of the *Union*, is a citizen of that state."

It has been settled by judicial interpretation, (*Corfield* v. *Coryell*, 4 Wash. C. C. R. 371,) that the privileges and im-

munities of a citizen, in the meaning of the constitution, are "those which are in their nature fundamental, which belong of right to the citizens of all free governments. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate; they may, however, all be comprehended under the following general heads: 1. Protection by the government. 2. Enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness. and safety, subject to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through or to reside in any other state, for purposes of trade, agriculture or professional pursuits, or otherwise; to claim the benefit of the writ of *habeas corpus*, to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal, may be mentioned as some of the particular privileges and immunities of citizens."

The thirteenth article of the constitution of *Indiana*, and the law made to enforce the same, deprive all persons of *African* descent, not living in the State at the time of the adoption of the constitution, 1. Of the protection of the government; 2. Of the enjoyment of life and liberty. And not only do they deprive them of all the privileges and immunities secured to every citizen by the constitution, but they denounce severe punishment upon all such persons who may come into the State, regardless of their mechanical skill, intellectual ability, or moral worth, or the services they may have rendered to the country. If persons of *African* descent are citizens of the *United States*, the legislation which denies to them every right of a citizen is void.

It will be conceded, without argument, in the language of Chief Justice TANEY, "that if the *African* ranks as a citizen in the State to which he belongs, within the meaning of the constitution of the *United States*, then whenever he

goes into another State the constitution clothes him, as to the rights of person, with all the privileges and immunities which belong to citizens of that State. And if persons of the *African* race are citizens of a State, and of the *United States,* they would be entitled to all of these privileges and immunities," &c., "under the paramount authority of the federal government, and its courts would be bound to maintain and enforce them, the constitution and laws of the State to the contrary notwithstanding. And if the States could limit or restrict them, or place the party in an inferior grade, then this clause of the constitution would be unmeaning, and could have no operation, and would give no rights to the citizen in another State." *Scott* v. *Sanford* 19 Howard 422, 423.---

If free native born *Americans* of *African* descent were citizens of the *United States,* to quote further from the same opinion, (p. 417,) "It would give to persons of the negro race, who were recognized as citizens in any one State of the *Union,* the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night, without molestation, unless they committed some violation of law for which a white man would be punished."

The only question then is: Are persons of *African* descent, or negroes, born free within the jurisdiction and allegiance of the *United States,* citizens thereof, within the meaning of the constitution?

The question was fully discussed in the very able and learned opinion of Attorney General BATES, of *November* 29, 1862, in which he decides, and as we think correctly, that a "free man of color, if born in the *United States,* is a citizen of the *United States.*" See, also, the opinion of Attorney General LEGARE, (4 Op. Atty. Genl. 147, *March* 15, 1843,) in which he came to the same conclusion, and held that a free

colored man was competent to pre-empt land under an act of Congress which limited that right to citizens, and aliens who had declared their intention to become citizens.

It would hardly be necessary to discuss this question but for the decision of the Supreme Court of the *United States* in *Scott* v. *Sandford, supra.* That case was determined in 1856, and although never formally overruled, it is now disregarded by every department of the government. Passports are granted to free men of color, of *African* descent, by the executive department. Congress, by its legislation, declares such persons citizens of the *United States*, and passes laws for their protection as such. The Supreme Court, in the face of its own decision, admits to its bar, as attorneys and counsellors at law, persons of *African* descent. CURTIS, J., in a dissenting opinion in that case, examined this question with great research, and with marked ability. Indeed, he has left but little, if anything, to be added. The constitution was ordained by the people of the *United States*, to secure the blessings of liberty to themselves and their posterity. At the time of its adoption, all free, native-born inhabitants of the States of *New Hampshire, Massachusetts, New York, New Jersey* and *North Carolina*, though descended from *African* slaves, were not only citizens of those States, but such of them as had the other necessary qualifications possessed the franchise of electors, on equal terms with other citizens. The Supreme Court of *North Carolina*, in *The State* v. *Manuel*, 4 Dev. & Bat. 20, in a well considered opinion, held that slaves manumitted there became freemen, and therefore, if born within *North Carolina*, are citizens of *North Carolina*, and that all free persons born within the State are born citizens of the State.

The fourth of the fundamental articles of the confederation was as follows: "The free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all the privileges and immunities of free citizens in the several States."

Smith *v.* Moody and Others.

The fact that free persons of color were citizens of some of the several States, and the consequence that this fourth article of the confederation would have the effect to confer on such persons the privileges and immunities of general citizenship, were not only known to those who framed and adopted those articles, but the evidence is conclusive that this article was intended to have that effect, and that language which would have excluded such persons was rejected. On the 25th of *June*, 1778, the articles of confederation being under consideration by congress, the delegates from *South Carolina* moved to amend this fourth article, by inserting after the word "free," and before the word "inhabitants," the word "white," so that the privileges and immunities of general citizenship would be secured only to white persons. Two States voted for the amendment, eight States against it, and the vote of one State was divided. The language of the article stood unchanged, and both by its terms of inclusion, "free inhabitants," and the strong implication from its terms of exclusion, "paupers, vagabonds and fugitives from justice," who alone were excepted, it is clear that under the confederation, and at the time of the adoption of the constitution, free colored persons of *African* descent might be, and by reason of their citizenship in certain States were, entitled to the privileges and immunities of general citizenship of the *United States*. There is no provision in the constitution itself depriving them of citizenship.

The constitution confers upon congress "the power to establish a uniform rule of naturalization." Alienage is the only disability to citizenship recognized in the constitution. The constitution was ordained "by the people of the *United States*" for themselves and their "posterity." Alienage, in the very nature of things, was the only disability to be removed, and that power was given to congress Allegiance on the one side, and protection due from the other, constitute citizenship under the constitution.

It is objected, that if free colored persons, born within a particular State, and made citizens of that State by its constitution and laws, are thereby made citizens of the *United States*, then, under the second section of the fourth article of the constitution, such persons would be entitled to all the privileges and immunities of citizens in the several States; and if so, that colored persons could vote, and be eligible not only to federal offices, but to State offices, even in States whose constitutions and laws disqualify colored persons from voting or being elected to office. This position rests upon a false assumption. Its basis is, that no one can be a citizen who is not entitled to all the privileges and franchises which are conferred on any citizen. This is not true under the constitution of the *United States*. The privilege of voting, and the legal capacity for office, are not essential to the character of a citizen, for women are citizens without either. A naturalized citizen cannot be President, nor a senator until after the lapse of nine years, nor a representative until after the lapse of seven years, from his naturalization. Yet, as soon as naturalized, he is a citizen. Indeed, in all the States, numerous persons, though citizens, cannot vote or hold office, on account of age, or sex, or the want of the necessary legal qualifications. By the act of congress of *April* 9, 1866, it is provided "that all persons born in the *United States* and not subject to any foreign power, excluding *Indians* not taxed, are hereby declared to be citizens of the *United States;* and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right in every State and territory in the *United States*, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and

shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

There can be no doubt of the power of congress to pass this act. So far as it defines citizenship, it is declaratory. There is no attempt either to enlarge or abridge the right of citizenship. And so far as disabilities had been engrafted on slavery, or had grown out of the relation of master and slave, article thirteen of the constitution of the *United States*, abolishing slavery, confers express power on congress "to enforce this article by appropriate legislation." We think the court below erred in overruling the demurrer to the defendant's answer, and in sustaining the demurrer to the plaintiff's reply.

The judgment is reversed, with costs, and the cause remanded, with directions to sustain the demurrer to the answer, and for further proceedings.

*J. T. Dye* and *A. C. Harris*, for appellant.