# THE PEOPLE OF THE STATE OF CALIFORNIA v. GEORGE WASHINGTON.

VALIDITY OF THE CIVIL RIGHTS BILL.—The provisions of the Act of Congress commonly known as the "Civil Rights Bill," (14 U. S. Stats. at Large, p. 27,) which provide that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States, and such citizens of every race and color * * * shall have the same right in every State and Territory of the United States * * * to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, * * * any law, statute, ordinance, regulation, or custom to the contrary notwithstanding," were not repugnant to the Constitution of the United States as it read prior to the adoption of the Fourteenth Amendment thereto, and are valid.

IDEM—EFFECT OF THE "CIVIL RIGHTS BILL" IN THE STATE OF CALIFORNIA.— The effect of the enactment of the "Civil Rights Bill" was to put all persons, irrespective of race or color, born within the United States and not subject to any foreign power, excluding Indians not taxed, upon an equality before the laws of this State in respect to their personal liberty.

IDEM—EFFECT ON ACT CONCERNING CRIMES AND PUNISHMENTS.—The fourteenth section of the statute of this State "concerning crimes and punishments," which

provides that "no Indian, or person having one half or more of Indian blood, or Mongolian, or Chinese, shall be permitted to give evidence in favor or against any white person," (Stats. 1863, p. 69,) so far as it discriminates against persons, on the score of race or color, born within the United States and not subject to any foreign power, excluding Indians not taxed, has, by the force and effect of the " Civil Rights Bill," become null and void.

IDEM.—W., who was a mulatto born within the United States and not subject to any foreign power, was indicted for the crime of robbing Ah Wang, a Chinaman. The indictment was found exclusively upon the testimony of Chinese witnesses. No other testimony against W. was procurable by the District Attorney for the purposes of a trial under said indictment. The Court below, on W.'s motion, set aside the indictment and discharged him without day. On appeal from said orders, taken by the People, this Court affirmed the judgment of the Court below.

APPEAL from the County Court of the City and County of San Francisco.

The facts are stated in the opinion of the Court.

*Jo Hamilton, Attorney General,* for the People.

[No brief on file for Respondent.]

By the Court, RHODES, J. :

The defendant was indicted for the crime of robbery. The person alleged· to have been robbed was a Chinaman named Ah Wang. The indictment was found exclusively upon the testimony of Chinese witnesses, and for that reason counsel for the defendant moved to set it aside. Thereupon, for the purpose of disposing of the whole case, as well as the motion, it was stipulated between the District Attorney and counsel for the defendant, that the defendant was a mulatto, born within the United States, and not subject to any foreign power ; that all the evidence in the case known to the District Attorney was the testimony of Chinese witnesses, who were born without the United States and within the Chinese Empire. In view of these facts the indictment was set aside, and the defendant discharged.

The case presents for our consideration the fourteenth section of the statute of this State in relation to crimes and

punishments, which provides that "no Indian or person having one half or more of Indian blood, or Mongolian, or Chinese, shall be permitted to give evidence in favor or against any white person," as affected by the adoption of the Thirteenth Amendment to the Federal Constitution, which provides that "neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction," and that "Congress shall have power to enforce this Article by appropriate legislation;" and the first section of the Act of Congress passed in pursuance thereof, entitled "An Act to protect all persons in the United States in their civil rights, and furnish the means of their vindication," which provides that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right, in every State or Territory of the United States, to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding." (13 U. S. Stats. at Large, pp. 774, 775; 14 U. S. Stats. at Large, p. 27.)

In view of the foregoing constitutional and statutory provisions, we are asked to determine whether the Act of Congress of the 9th of April, 1866, commonly called the "Civil Rights Bill," so far as it bears upon the question before us, was repugnant to the Constitution of the United States as it read prior to the adoption of the Fourteenth Amendment;

and if not, what has been its effect upon the fourteenth section of the statute of this State in relation to crimes and punishments?

We regret that we are called upon to decide so important a question without any argument on the part of the defendant.

The nature and objects of the Act first claim our attention. The Attorney General claims " that it at least only extended and only could extend to the *political* rights of white persons and negroes, and no further." A slight examination of the Act would readily show this position to be untenable. The title of the Act is, " An Act to protect all persons in the United States in their *civil rights*, and furnish the means of their vindication." The first clause of the first section declares " that all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." It is the general, and we think the better, opinion that this provision, in view of the abolition of slavery, is only declaratory. One of the most distinguished, and perhaps the leading opponent of the passage of the bill, entertained that view, but differed with the majority in respect to the extent of the operation of the rule; he holding that while it was true that by virtue of their birth the persons named became citizens of the United States, it did not follow that they became citizens of the State of their birth. If the latter position is tenable—if a person residing in one of the States can be a citizen of the United States and not, at the same time, a citizen of any particular State, it will make no difference in the result of the present inquiry.

Whether the clause of the section under consideration is merely declaratory, or whether it, in effect, makes citizens of those who before were not entitled to that appellation, it only declares or establishes the status of such persons. This does not directly confer political rights, or more accurately speaking, powers or privileges, nor do they necessarily result from such status. Native born infants and females are citizens of the State of their birth or residence, but possess no

political rights. Persons becoming citizens by naturalization do not, thereby, acquire political rights, but such rights are derived from the Constitution and laws of the State of their residence. " Civil rights," as defined by Bouvier, " are those which have no relation to the establishment, support or management of Government. These consist in the power of acquiring and enjoying property, of exercising the parental and marital power, and the like." They are the absolute rights of persons, the right of personal security, the right of personal liberty, and the right to acquire and enjoy property, as regulated and protected by law. They are the rights which, according to the fundamental principles of American Government, are inalienable.

" Political rights," says the same author, " consist in the power to participate directly or indirectly in the establishment or management of Government." The elective franchise and the right to hold public offices constitute the principal political rights of citizens of the several States.

The absolute rights of persons have no necessary connection with the establishment or management of Government. Females, infants, the Chinese and Indians are entitled to the benefit of the writ of *habeas corpus*, may sue, contract, hold property, etc., but it is preposterous to assert that the possession of those rights implies the possession of the elective franchise, or the right to discharge the duties of a public office. Did the Act in fact confer political rights, all the other provisions of the Act were unnecessary and useless, for the ballot is the safeguard of civil as well as political rights.

In the same section certain rights are secured to those who are declared to be citizens of the United States. It is provided that they shall have "the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, to *give evidence*, to inherit, purchase, lease, sell, hold and convey real and personal property, and to *full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens*,

and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding." Most of the rights here enumerated are such as are enjoyed by aliens as well as citizens, and, indeed, all the residents of the United States, except those laboring under the disabilities growing out of the condition of slavery. But some of the rights mentioned go beyond that line, as the right to inherit property, to give evidence, the right to the full and equal benefit of all laws for the security of person and property as is enjoyed by white citizens; and it is claimed that the regulation of these and the like matters belongs to the several States. If it be admitted that this was true before the adoption of the Thirteenth Amendment to the Constitution of the United States, yet upon the adoption of that amendment legislation of the character of the Civil Rights Bill became appropriate; and in order to confer full authority therefor, the second section of the amendment was adopted, which provides that "Congress shall have power to enforce this Article by appropriate legislation." At common law one of the usual divisions of persons was into the comprehensive titles of aliens and native born subjects. The term *citizen* is now nearly synonymous with that of *subject* at common law. But under our system of government there was a third class, the persons of which it was composed being neither aliens nor citizens. "Indians not taxed," and slaves, composed the main portion of this class. As most of the persons of African descent within the United States were introduced as slaves, or were the descendants of slaves, they were not regarded in some of the States as citizens, and in the midst of the great political conflicts which preceded the civil war, the Supreme Court of the United States (some of the Justices dissenting) held that a negro was not a citizen of the United States, and consequently could not sue in their Courts. (*Dred Scott* v. *Sandford,* 19 How. 393.) Persons of that race were, in several of the States, subject to disabilities, restrictions, and penalties

to which white persons were not liable, and others were being added by laws enacted for that purpose.

The object of the adoption of the first section of the Thirteenth Amendment to the Constitution was not only to effect the emancipation of all persons then held in slavery, but also to forever thereafter deprive both Congress and the respective States of any and all power to reduce either the persons so emancipated or any others within the jurisdiction of the United States to the condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted. And the object of the second section was to enable Congress, by appropriate legislation, to secure the persons so emancipated, as well as all others, while within the jurisdiction of the United States, in the full enjoyment of that personal liberty contemplated in the first section; or, in other words, the Thirteenth Amendment was at least intended to make all men born in the United States, without reference to color, equal before the law with respect to *personal liberty*, one of the absolute rights of man, and to give Congress power to pass any and all laws necessary and proper to accomplish that end. Undoubtedly, to secure *personal freedom* to all within the purview of its provisions, was the first great and leading object of the Thirteenth Amendment. *Personal security*, and the right to acquire and enjoy private property—and these cover the remaining elements of one's civil rights—would certainly seem to be powerful auxiliaries to the maintenance of *personal liberty*. The continued enjoyment of *personal liberty* cannot well be assured without the enjoyment of *personal security*. And the right to acquire and enjoy private property would seem to be necessary to give that independence and freedom from want essential to the full enjoyment of personal liberty. Whatever, therefore, tends to maintain and assure to a person personal security, and to protect him in the acquisition and enjoyment of private property, would seem to aid in the maintenance of his personal liberty. Congress doubtless took this view in passing the Civil Rights Bill, and extended

its provisions to these auxiliary and cognate rights.   But it is still apparent that the great and leading object was the maintenance of the persons provided for in their *personal liberty*, and it is *in this aspect only* that we are now called upon to consider it.   If other and cognate or collateral objects, not strictly within the scope of its constitutional powers, were introduced, going beyond this, (in regard to which, however, we now express no opinion,) this will not affect the validity of the Act as to those provisions which bear directly upon the main object, the protection of personal liberty and enforcement of the amendment designed to secure it.

That the Civil Rights Bill, so far, at least, as it bears upon the question now under consideration, (and we have at present no concern with other provisions contained in it,) is appropriate legislation for the enforcement of the rights provided for in the first section of the Thirteenth Amendment, it seems to us there can be no serious question.   The first section, being self-executing in the emancipation of the persons then held in slavery, and in providing for the inviolability of the personal liberty of all for the future, we can conceive of no legislation appropriate to enforce the rights thus conferred and guaranteed, except such as practically tend to facilitate the securing to all, through the aid of the judicial and executive departments of the Government, the full enjoyment of personal freedom.

In the administration of justice the subject of evidence occupies a large space.   It is the means by which the judicial branch of the Government is informed of the violation of that personal liberty which this amendment of the Constitution guarantees to all persons within the jurisdiction of the Federal Government, and whereby it is enabled to perceive the wrong and apply the proper remedy for enforcing the right.   It is ordinarily the proper function of the legislative department of Governments to prescribe rules as to the production and competency of evidence.   It would seem,

as a general proposition, that a rule of evidence which is best adapted to elicit the truth, facilitate the administration of justice, and protect personal liberty as to one class of persons, ought to be the best adapted to accomplish the same end as to all living under the protection of the same Government. At all events, the establishment of different rules as to the competency of evidence applicable to different classes of persons may tend to the advantage of one class and to the oppression and encroachment upon the personal liberty of another. For example, it is not difficult to perceive, if the individuals of the entire class likely to be reduced to the condition of involuntary servitude are excluded from testifying against the class likely to attempt to deprive them of their liberty, or in any matter arising between the two classes, while the other class is at full liberty to testify in such cases, that the strong tendency of such a rule of evidence would be to obstruct the operation of the amendment in question, and overthrow that personal liberty guaranteed by it; and it would seem to be self-evident that a law providing that the same rule of evidence should apply to both parties, placing the class likely to be reduced to servitude upon an equal footing with the other in respect to the right to testify as to the encroachment upon their personal liberty, would strongly conduce to the enforcement of this constitutional provision. So, a law which, while it would not permit a class of persons deemed unworthy to testify against a white person in a matter where such white person's personal liberty is concerned, would yet allow them to testify against a black person in a similar case, would discriminate against the personal liberty of the latter, and also tend to obstruct, as to him, an equal enforcement of the amendment in question. Such discriminations might well tend to affect the security of that personal liberty which the amendment to the Constitution guarantees to all. This being so, it seems clear to us that under the provision in question Congress is fully authorized to judge of the necessity of legislation upon the subject, and, if found necessary, to prescribe that all alike,

black and white, shall be entitled to "give evidence;" and further, that the rules of evidence shall apply equally to all alike, in order that all may, in the language of the Civil Rights Act, have the "full and equal benefit of all laws and proceedings for the security of person," etc. This provision prescribing a uniform rule of evidence with reference to all classes embraced in the broad terms of the amendment, necessarily bears directly upon the great right of personal liberty which its adoption was expressly designed to secure. To secure the enforcement of this provision was the leading object of the Civil Rights Act, and this precise provision is the only one the constitutionality of which is involved in this case, or upon which we now express any opinion. If such legislation is not "appropriate" to enforce the provision for personal liberty in question, we are at a loss to know what would be appropriate.

The constitutionality of the Act need not be further discussed at this time, as it was fully considered by Mr. Justice Swayne, in the Circuit Court of the United States for the District of Kentucky, in *The United States* v. *John Rhodes et al*, Am. Law Reg., February, 1868, and by the Supreme Court of Indiana in the case of *Smith* v. *Moody*, 26 Ind. 299. In both cases the constitutionality of the Act was fully sustained, and it may be safely rested upon the authority of those cases. We may add, however, that in view of the universal practice of the Federal Government, from the commencement to the present time, there would seem to be little doubt, if any, as to the power of Congress to admit by law to the rights of American citizenship entire classes or races, not under the disabilities of slavery, who were born and continue to reside within the United States, or upon soil acquired by the General Government. Races, tribes and communities, irrespective of color, have been admitted in mass and by a single act of national sovereignty in repeated instances. This was done by the treaty of April, 30th, 1800, by which the United States acquired the Territory of Louisiana; also, by the treaty of 1819, by which Florida was acquired;

also, by the treaty of 1848, by which California was added to the national domain; also, by the annexation of Texas and her admission into the Union; also, by the treaty of September 27th, 1830, by which certain heads of families of Choctaws were admitted to the rights of citizenship; also by the treaty of December 29th, 1855, by which the same thing was done in respect to the Cherokees; and also by the Act of March, 3d, 1843, by which the Stockbridge tribe of Indians was admitted to full citizenship. In view of this repeated and continuous practice of the National Government in respect to persons not born upon American soil, a much stronger argument than has yet been adduced, so far as we are advised, must be brought forward, before we can feel justified in denying to Congress the power, by statute, to confer the rights of citizenship upon all native born persons, now that the disability of slavery has been removed. It would be a remarkable anomaly, as remarked by Mr. Justice Swayne, in the case already cited, if the National Government, without the Thirteenth Amendment, could confer citizenship on aliens of every race and color, and citizenship with both civil and *political* rights on the "inhabitants" of Louisania, Florida, and California, irrespective of *race or color*, and cannot with the help of that amendment confer on those of the African race who have been born and always lived upon American soil all that the Civil Rights Act seeks to give them. It is no answer to say that the acts referred to were done under the "treaty making power." A treaty is but a part of the "law of the land," and what is forbidden by the Constitution can no more be done by a treaty than by an Act of Congress.

The Attorney General further contends, however, that the Act cannot be construed so as to affect the internal police of a State or the conduct of its Courts, without the total abolition of State sovereignty; and he asks, "if a sovereign State cannot conduct its own internal police regulations independent of the Federal Government, what element of sovereignty has a State? * * Can it be said she is sovereign for one purpose, but is not for another?" This position is answered

by the Thirteenth Article, which, as we have seen, confers
upon Congress the requisite power to pass all laws appropri-
ate to the end in view. In *McCulloch* v. *Maryland*, 4 Wheat.
421, it was considered that under the authority granted to
Congress "to make all laws which shall be necessary and
proper for carrying into execution the foregoing powers,"
etc., Congress might pass such laws as were appropriate for
the execution of the powers of Government; the phrase
"appropriate" being used by the Court as equivalent to
"necessary and proper." As to what would be appropriate
legislation to enforce that Article, no suggestions are made by
counsel, and it is difficult to conceive of any law more appro-
priate to that end than the portion in question of the first
section of the Civil Rights Bill. The extreme State rights
doctrine, shadowed forth by the counsel's proposition, may
be dismissed with the remark that it is fully met by a fur-
ther portion of his argument in which he says: "I acknowl-
edge for the State her duty, her obligation to the sovereign
power, and that whether the exercise of these sovereign
powers which Congress possess, suit the State or not, she is
bound to submit to them, as one sovereign submits to
another in that in which it is his sovereign duty to submit.
And in making this admission lies the strength of the posi-
tion. While she, as sovereign, is bound to submit to the
just exercise of power, and even to the unjust exercise of
constitutional power, the Federal Government as sovereign
cannot encroach upon reserved powers."

We do not read the Act as counsel does. He seems to
apprehend that, if the Act is upheld, it will break down all
the statutes of this State in respect to witnesses and testi-
mony, which differ from the statutes of any other State—
that as our statutes, which permit parties to civil actions,
defendants in criminal prosecutions, etc., to testify in their
own behalf, differ from those of other States, ours must
yield, "or you destroy the equality of rights enjoyed by citi-
zens of the different States." The Act does not purport to
equalize the rights of all persons, or to declare that they are

of the same extent in all the States, nor is such its effect. It assures to all the citizens of any State the civil rights enjoyed by white citizens of the same State; or, in other words, it prohibits all discrimination between citizens in the State of their residence, on the score of race or color, in respect to their civil rights, but leaves their political rights, which are the rights to vote and hold public offices in the gift of the State, with the power to confer or withhold them at pleasure. If in a given State the title to real property of any character may be conveyed by writing not under seal, then *all* citizens, of every race and color, may convey property of that character in the same mode. A statute providing that in a certain contingency the estate of a deceased person shall descend to the wife and children in equal shares is, by the Act, made applicable to all the citizens of the State. And so of the statutes regulating the competency of witnesses. The operation of the Act is to make them applicable alike to all the citizens of the State, without regard to race or color, and without regard to the rules upon that subject prevailing in other States.

It is due to the Attorney General to say that, at the time of the preparation of his brief, he had not the benefit of the very able and exhaustive opinion of Mr. Justice Swayne, mentioned already.

Our conclusion is that the portion of the Civil Rights Act now in question—and we are not called upon to consider any other—was not repugnant to the Constitution of the United States as it read prior to the adoption of the Fourteenth Amendment, and that its effect was to put all persons, irrespective of race or color, born within the United States and not subject to any foreign power, excluding Indians not taxed, upon an equality before the laws of this State in respect to their personal liberty; and that the fourteenth section of the statute of this State in relation to crimes and punishments, so far as it discriminates against persons on the score of race or color, born within the United States and not subject to any foreign power, excluding Indians not

taxed, has, by the force and effect of the Civil Rights Act, become null and void.

We deem it not out of place to suggest, in conclusion, that there may be a, doubt as to the validity of the fourteenth section of the statute in relation to crimes and punishments when tested by the provisions of the Constitution of this State, irrespective of the Federal Constitution or the Civil Rights Act.

The provisions of the Constitution of this State to which we especially refer are sections eleven and seventeen of the First Article. The former provides that "All laws of a general nature shall have a uniform operation;" and the latter, that "Foreigners who are or who may hereafter become *bona fide* residents of this State, shall enjoy the same rights in respect to the possession, enjoyment and inheritance of property as native born citizens." And perhaps an argument of much force might be drawn from the first section of the same Article, which affirms the right of enjoying and defending life and liberty, and of acquiring, possessing and protecting property.  Doubtless much could be said to show that a statute which permits a person to become a witness in certain cases and not in certain other cases, does not operate uniformly, and that the right to testify in our Courts is indispensable to aliens to enable them "to possess, enjoy and inherit property upon the same terms as native born citizens."  But these points have not been made, and we do not feel that we are called upon, or that we would be justified in determining questions of so grave a character without argument, and without being called upon to do so, especially since the adoption of the Fourteenth Amendment to the Federal Constitution, which has been recently proclaimed, and which, as is claimed by some, may supersede all that our Constitution contains upon that subject.  The Fourteenth Amendment goes one step further than the Civil Rights Act, and after declaring who are citizens of the United States, and securing them in the enjoyment of their privileges and immunities, contains a provision applicable to *all persons,*

whether citizens or not, in these words: "Nor shall any State deprive any person of life, liberty or property without due process of law, *nor deny to any person within its jurisdiction the equal protection of the laws.*"

Judgment affirmed.

Mr. Justice CROCKETT delivered the following dissenting opinion, in which Mr. Justice SPRAGUE concurred:

Being unable to agree with the majority of the Court, in the conclusions at which they have arrived in this case, I propose to state the reasons which have influenced my judgment.

Section fourteen of the statute of this State, concerning crimes and punishments, provides that "no Indian or person having one half or more of Indian blood, or Mongolian or Chinese, shall be permitted to give evidence in favor or against any white person."

The defendant in this case is a negro, born within the United States, and is accused in the indictment of robbing a Chinaman; and it was proposed at the trial to support the indictment solely by the testimony of Chinamen born within the Chinese Empire. The Court below ruled out the evidence on the ground that the testimony of a Chinaman was not admissible against a negro, under the conditions stated, and the propriety of this ruling is the only question presented on the appeal.

The statute only disqualifies Indians, Mongolians and Chinese from testifying for or against "*any white person.*" It was never doubted that they were competent to testify for or against each other, and it has been the uniform practice of the Courts of this State to admit such testimony without any question of its propriety, so far as I am advised. Nor do I understand the majority of the Court as maintaining the contrary, except upon the grounds that by the Thirteenth Amendment of the Federal Constitution and the Act of

Congress of April 9th, 1866, generally known as the Civil Rights Bill, the statute of this State, before quoted, has been in so far superseded or modified as to place the negro, born in the United States, in respect to all his civil rights, on the same footing with the white man; and assuming this to be his *status*, the argument is, that inasmuch as a foreign born Chinaman cannot, under our statute, testify against a white person, *ergo*, he cannot testify against a native born negro, who, by the Act of Congress, is endowed with precisely the same civil rights that appertain to white persons. The first section of the Act of Congress provides "that all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding."

It is said that under this section the native born negro is entitled to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens; and that in this State one of the laws of which white persons have the benefit, for the security of their persons and property, is the fourteenth section of the Act concerning crimes and punishments already quoted, whereby Mongolians and Chinese are prohibited from testifying against white persons, and from this the argument is deduced that the native born negro is entitled to the benefit

85

of that provision to the same extent as white persons. Without stopping to inquire into the soundness of this construction of the Act, I proceed to state why, in my opinion, the Act itself is in violation of the Constitution of the United States, and therefore void.

It may be safely assumed as a political and legal axiom, maintained by the Courts through an unbroken series of decisions, and by eminent statesmen of all shades of opinion, that the Government of the United States is one of limited and enumerated powers, and that Congress can exercise no powers except those expressly granted in the Constitution, and such others as " shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or any department or officer thereof." (Art. I, Sec. 8, subdivision 19.) It is quite as well established by the same weight of authority, that the several States in their sovereign capacity retain all the mass of powers which a sovereign State can exercise, which are not, either expressly or by necessary implication, granted to the Federal Government. I am not aware that these propositions are questioned or denied by any respectable statesman or jurist at this day. It is not claimed by any one that the Constitution of the United States, prior to the adoption of the Thirteenth Amendment thereto, conferred upon Congress, either by express grant or by necessary implication, the power to declare by law, paramount in its obligation to all State laws, what persons or classes of persons in the several States should or should not be entitled to " make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens," and that such persons " shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding." Prior to the adoption of the Thirteenth

Amendment, it was conceded on all sides that each State had the exclusive right to prescribe by its own Constitution and laws who should or should not be entitled to make and enforce contracts, sue and be sued, and give evidence in its Courts, inherit, purchase, lease, sell, hold and convey property, and to define the punishment, pains and penalties to be inflicted on any violator of its laws, subject, however, to the limitation contained in Article IV, section two of the Constitution, which provides that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."

Subject only to this limitation, it has been the practice from the earliest period of our existence as a nation, for each State, by its Constitution and laws, to exercise these powers unquestioned, often discriminating between classes of its own citizens, as its views of public policy dictated. The proceedings and debates of the Convention which framed the Constitution render it morally certain that the States which were represented in that august body would not have conceded to the Federal Government the power to interfere in such vital questions of their internal policy as those relating to the making and enforcement of contracts, the prosecution and conduct of suits in their Courts, the law of inheritance, the tenure of property, and the punishment of crime. These embraced the most important functions to be exercised by any Government for the protection of private rights and the preservation of public order. Deny to a Government the right to regulate, at its absolute discretion, the laws of inheritance, the tenure of property, the conduct of suits in its Courts, and the punishment of crime, and but little will remain which will be worth preserving. At an early period after the adoption of the Constitution, fears were entertained that there might, in the future, grow up such a latitude of construction as gradually to abridge the power of the States over their internal policy, and to absorb in the Federal Government important powers reserved to the States. Consequently, in 1789, only two years after the adoption of the

Constitution, Congress proposed ten amendments to it, which were afterward duly ratified, and now form a part of that instrument. The tenth amendment is in these words, to wit: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people."

In commenting upon this clause, Mr. Justice Story says: "This amendment is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the Constitution. Being an instrument of limited and enumerative powers, it follows irresistibly that what is not conferred is withheld, and belongs to the State authorities, if invested by their Constitutions of government respectively in them; and if not so invested, it is retained by the people as a part of their residuary sovereignty." And again he says: "Its sole design is to exclude any interpretation by which other powers should be assumed beyond those which are granted." (Story on the Constitution, Secs. 1,907, 1,908.)

Assuming this to be the true theory of the Constitution, as it unquestionably is, no clause can be found in that instrument, unless it be in the Thirteenth Amendment, proposed February 1st, 1865, which confers upon Congress, either expressly or by implication, the power to enact the Civil Rights Bill; and, as I understand the opinion of a majority of the Court, it maintains the constitutionality of the Act *solely* on the assumption that the Thirteenth Amendment conferred upon Congress the requisite authority to pass it.

That amendment is in these words:

"SECTION 1. Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"SEC. 2. Congress shall have power to enforce this Article by appropriate legislation."

This amendment proposes to accomplish but one object, to wit: to abolish slavery and involuntary servitude, except

as a punishment for crime, throughout the United States. No ingenuity or sophistry can infuse into it any other purpose than this.

The second section confers upon Congress "power to enforce this Article by appropriate legislation." The first question arising under this clause is, what was it which Congress was empowered to enforce? The answer is too obvious to admit of discussion, to wit: to enforce the prohibition or rule of law announced in the first section, that "neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States." Whatever legislation was necessary to render this prohibition effectual and to prevent the re-establishment of slavery or involuntary servitude, except as a punishment for crime, Congress was empowered to adopt. It might impose pains and penalties upon persons seeking to hold another in slavery, and provide appropriate remedies to enable persons held in servitude to assert and maintain their freedom. The complete abolishment of slavery or involuntary servitude, except for crime, being the sole purpose of that amendment, Congress was empowered to do whatsoever was necessary to render the emancipation effectual; but at this point its power in the premises ceased. Freedom from slavery or involuntary servitude being the ultimate fact and the only result proposed by the Thirteenth Amendment, Congress is authorized to do whatever is needful to secure that end; and if that were the only effect of the Civil Rights Bill, or if its provisions tended even remotely to promote that result, it would doubtless, to that extent, be a valid enactment. But the Act is not addressed to this purpose, and its provisions have a much broader scope than this. After declaring that all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, shall be citizens of the United States, it provides that such citizens, of every race and color, without regard to any previous condition of slavery, shall have the same right in every State and Territory to make and

enforce contracts, sue and be sued, give evidence, inherit, purchase, sell, lease, hold, and convey property, as is enjoyed by white citizens. Those who maintain the constitutionality of the Act insist that these rights and privileges are incident to and inseparable from citizenship and the state of freedom secured to all classes of native born citizens by the Thirteenth Amendment, and consequently, that legislation tending to secure these rights is "appropriate legislation" within the true sense of that amendment. In the opinion of a majority of the Court the proposition is thus stated:

"Undoubtedly, to secure personal freedom to all within the purview of its provisions, was the first great and leading object of the Thirteenth Amendment. Personal security and the right to acquire and enjoy private property—and these cover the remaining elements of one's civil rights—would certainly seem to be powerful auxiliaries to the maintenance of personal liberty. The continued enjoyment of personal liberty cannot well be assured without the enjoyment of personal security. And the right to acquire private property would seem to be necessary to give that independence and freedom from want essential to the full enjoyment of personal liberty. Whatever, therefore, tends to maintain and assure to a person personal security, and to protect him in the acquisition and enjoyment of private property, would seem to aid in the maintenance of his personal liberty. Congress doubtless took this view in passing the Civil Rights Bill, and extended its provisions to these auxiliary and cognate rights."

If I comprehend these propositions aright, they may be summed up as follows, to wit: First—That the object of the Thirteenth Amendment was to secure personal freedom to all native born citizens of the United States. Second—That the right to personal freedom and personal security, together with the right to acquire and enjoy private property, constitute the elements of one's *civil* rights. Third—That the right of

personal security, and the right to acquire and enjoy private property, are powerful auxiliaries to the maintenance of personal freedom.    Fourth—That being such auxiliaries, whatever legislation tended to secure them was "appropriate legislation" within the true intent of the second section of the Thirteenth Amendment.

If this be the correct theory, and if the Thirteenth Amendment embraces so wide a scope as this, it results of necessity that Congress has supreme authority over all our civil rights, and may at its discretion change, modify, or abolish all State laws relating to personal security or the acquisition and enjoyment of private property, and substitute others in their stead, on the pretext that it is necessary to do so in order to secure personal freedom to all.    On the plea that it is necessary to provide safeguards for personal security, as an auxiliary to personal freedom, it may regulate in detail, in every State, the actions of assault and battery or false imprisonment, and particularly the writ of *habeas corpus*, prescribing when and how it shall issue, and what shall or shall not be competent evidence in these and similar actions.    On the pretext of securing to all the right to acquire and enjoy private property, as an auxiliary to the right of personal freedom, it may define the tenures of property, regulate the law of descents, provide appropriate remedies for violations of every right of property, and practically supersede all State laws on these important subjects. If Congress possesses these enormous powers, it only remains for it to put them into execution; after which the State Governments had as well be abolished, as a useless, expensive, and cumbersome machinery, no longer of any practical value.

Proceeding on the assumption that under the second section of the Thirteenth Amendment Congress has the authority to pass any law for the protection of personal security, as an auxiliary to the right of personal freedom, the majority of the Court maintains that Congress has the power to declare, and by the Civil Rights Bill has declared, that, in the matter of evidence in the Courts there shall be

no discrimination between native born citizens of any race or color. The argument is, that if a certain character of evidence be admissible for or against a certain class of citizens, and not admissible for or against a certain other class, the excepted class may thereby be endangered in the enjoyment of their personal freedom, and that, to avoid this peril, it was "appropriate legislation" for Congress to abolish the discrimination, and place both classes on the same footing.

There would be some force in the argument if the principle was confined only to cases wherein an attempt was made to reduce a citizen or class of citizens to slavery or involuntary servitude. If Congress had declared that in such cases (which is clearly the only class of cases contemplated by the first section of the amendment) there should be no discrimination between one citizen or class of citizens and any other citizen or class of citizens in the rules of evidence, such legislation might have been "appropriate," as having a tendency to maintain the provisions of the first section of the amendment. But the Civil Rights Bill goes far beyond this. It undertakes to abolish all distinctions between citizens of the United States, not only in the matter of making and enforcing contracts, inheriting, purchasing, or selling property, and in giving evidence in every class of cases, but also provides that they shall be entitled "to full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white persons." Whilst I can comprehend how it might be important to a person threatened with bondage to be entitled, in the vindication of his rights in that regard, to the benefit of the most liberal rules of evidence, I do not perceive on what reasonable ground it can be claimed that his freedom may be endangered if he is denied the same latitude in the rules of evidence in respect to matters which in no degree touch the question of his freedom. The case we are considering affords a striking illustration of this distinction. If the defendant was in danger of being reduced to bondage, he might justly claim that he was entitled to the benefit of the most liberal

rules of evidence, in order to secure the freedom which is guaranteed to him by the Thirteenth Amendment. But inasmuch as he is accused of a crime against the law, and the question of his freedom, in the sense contemplated by the Thirteenth Amendment, is in no manner involved, what authority has Congress to prescribe the rule of evidence which shall govern his trial? Or if it were an action of debt or assumpsit on a promissory note, how would the question of his freedom be affected, one way or the other, by the rule of evidence at·the trial? To my mind nothing could be plainer than that Congress, under the second section of the amendment, has no power whatever to interfere in such a case.

The Thirteenth Amendment is entirely silent as to the *civil* rights of any class of persons, and does not assume to define how the civil rights of any one are to be affected, leaving such rights to be dealt with, as they had theretofore been, by the local laws of the States.

If this bill be a valid enactment, no State has the power to prohibit marriages between native born negro men and white women; because marriage is, in law, only a civil contract, and the bill provides that all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are citizens, and that such citizens, *of every race and color*, shall have the same right to make and enforce contracts as is enjoyed by white persons. Marriage being in law only a civil contract, and every unmarried white man of lawful age having the right to marry a white woman, it follows as a logical sequence that every native born black man is entitled to the same right, if the Civil Rights Bill be a valid law; and that, too, in defiance of any State law to the contrary. It may also happen that a State may be influenced by considerations of public policy to deny to certain races or classes the right to inherit, purchase, or hold real estate. The State of California, for example, with a view to discourage emigration from China or Japan, might

see fit to deny to the descendants of those races born in this State the right to inherit, hold, or transmit real estate; but though the strongest considerations of State policy might dictate this course, all State laws enacted for that purpose would be void if the Civil Rights Bill be valid. So, too, there may be in a State a degraded, brutal, and vicious race, peculiarly addicted to crime and vice, and demanding more stringent regulations for their government than are required for the general mass of citizens; but the Civil Rights Bill forbids any discrimination, and the State would be powerless to protect itself against a great and perhaps growing evil. So, too, in perhaps every State of the Union, minors and married women, on grounds of public policy, are disabled by law from making valid contracts; but if Congress should decide that these restrictions are restraints on the state of freedom established by the Thirteenth Amendment, they might supersede all State laws on the subject, and this would be deemed to be "appropriate legislation" under the second section. Illustrations might be multiplied almost indefinitely to show that the Civil Rights Bill withdraws from the States a mass of powers essential to the maintenance of order and the administration of local government, and which the wise men who framed the Constitution jealously withheld from the Federal Government, conceding to it only such powers as were deemed essential to the proper conduct of national affairs, but reserving to the States the mass of powers pertaining to the administration of local government. Amongst these none were of so great importance as the right to regulate contracts, the administration of justice, the tenures of property, and the punishment of crime. The Civil Rights Bill infringes upon the power of the States over these subjects in many important particulars, and the theory on which it is founded is so repugnant to that on which the Constitution was originally based, that it should not be upheld on a doubtful construction merely. Nothing short of the most explicit language in an amendment to the Constitution would

justify legislation so entirely subversive of the theory on which the Government was originally founded.

But if it be true that the second section of the Thirteenth Amendment was adopted only to enable Congress to secure to those whose condition was changed from that of slavery to freedom, the full benefit and protection of the laws enjoyed by white persons, then it evidently can have no application to this case, inasmuch as it does not appear from the record that the defendant ever was a slave; but if the purpose of the amendment was to make all men born within the United States equal before the law in respect to their *civil* rights, it has utterly failed to indicate that purpose. The last proposition is not a correlative of the first. To secure to those whose condition was changed from that of slavery to freedom the full benefit and protection of the laws enjoyed by white persons, would apply only to the class of emancipated slaves; but to make all men born within the United States equal before the law, in respect to their *civil* rights, is a wholly different proposition, and of much wider scope. If the latter be the true purpose of the Civil Rights Bill, as it undoubtedly is, it follows of necessity that it was not designed simply to secure to slaves who were emancipated by the Thirteenth Amendment the full benefit and protection of the laws enjoyed by white persons, but also to operate upon those who never were slaves; as, for example, upon the descendants of Chinese, Malays or Japanese, born within the United States. If this be the purpose and scope of the Act, it is an attempt on the part of Congress, under the plea of legislation, designed to enforce the prohibition of slavery or involuntary servitude, contained in the Thirteenth Amendment, to supersede all State legislation on an important class of subjects, which do not, in any sense, fall within the purview of the Thirteenth Amendment. I do not perceive what necessary or even remote relation there is between the prohibition of slavery and the proposition that a son of Chinese parents, born within the United States, shall have the same right to inherit, purchase, sell, lease, hold and con-

vey property as is enjoyed by white persons; or the proposition involved in this case, to wit: that because a Chinaman is prohibited by law from testifying against a white person, therefore he shall not testify against a colored person who never was a slave; or the proposition that because a white man has the lawful right to make a contract of marriage with a white woman, every colored man born within the United States shall have the right to contract marriage with a white woman, in defiance of any State law to the contrary. If all these propositions, and numerous others of a similar character, come within the purview of the Thirteenth Amendment, it is not difficult to demonstrate that, under the pretext of enforcing the prohibition of slavery by "appropriate legislation," Congress might practically absorb all the powers of the State Governments, in matters pertaining purely to the administration of local affairs. It might decide that discriminating taxes imposed by a State on its own citizens, though warranted by its Constitution, or the establishment of separate schools for white and colored children, or the enforcement of laws for the observance of the Sabbath by Chinese or Japanese residents, or police regulations intended to preserve order amongst a certain vicious class of the community, such as Chinese prostitutes or gamblers, or health regulations, applicable alone to a degraded class of colored population, all tended to infringe upon the prohibition of slavery contained in the Thirteenth Amendment, and were therefore void. Congress, it is claimed, is the sole judge of what is "appropriate legislation" to accomplish the end contemplated in the Thirteenth Amendment; and if the Civil Rights Bill be maintained by the Courts as a valid exercise of the constitutional powers of Congress, it is quite evident that the division of power between the State and Federal Governments, as originally established by the Constitution, has been abrogated by the Thirteenth Amendment; and instead of a National Government to administer purely national affairs, and State Governments to administer the local affairs of the several States, the power of local admin-

istration has been practically transferred to the Federal Government, and the State Governments have been emasculated of the chief portion of the mass of powers reserved to them originally.

All that Congress was authorized to do was to see that the prohibition of slavery was not infringed. But, instead of this, it has undertaken to define, not only the civil rights of emancipated slaves, but of all other persons born within the United States not subject to any foreign power, except Indians not taxed. This is done on the plea that, inasmuch as the Thirteenth Amendment establishes a condition of universal freedom in the United States, all legislation is appropriate to enforce that result, which secures to all persons the rights of freemen. If by the term "the rights of freemen" is to be understood the right not to be held in slavery or involuntary servitude, the proposition is sound; but if the term "rights of freemen" is intended to include all the social and civil rights which men enjoy under a free form of government, then it follows from this interpretation that Congress, by virtue of the second section of the amendment, may supersede all State laws on all subjects affecting the social or civil *status* of every individual citizen of the United States; and this would practically withdraw from the State Governments all that mass of powers by which they have hitherto defined the rights, duties and obligations of their citizens toward each other and to the State. It would practically annihilate the power of the State over its own citizens and within its own territory, and transfer to the Federal Government the authority to exercise the most important functions pertaining to a local government. In my opinion the Thirteenth Amendment contemplated nothing of the kind.

Nor can it escape observation that the same argument which attempts to uphold the Civil Rights Bill, if carried to its legitimate conclusion, would concede to Congress the right to regulate the ballot in the several States. If Congress has the power to enact this bill on the plea that in order to

enable a freeman to maintain his freedom, it is necessary to secure to him the right to make and enforce contracts, sue and be sued, testify in Courts, inherit, purchase, lease, sell, hold, and convey real and personal property, it would seem to follow as a logical result that it also has the power to confer upon him the ballot, as one of the most potent methods of maintaining his freedom.    If it be "appropriate legislation" under the Thirteenth Amendment to confer upon all native born persons in the United States the civil rights which are enumerated as a legitimate method of maintaining their freedom, why withhold from them the ballot, the most potent of all methods?    It cannot be denied that it is competent for Congress to regulate the ballot in every State, provided it has the constitutional power to pass the Civil Rights Bill.    If it can confer civil rights as a means of securing freedom, why not political rights for the same purpose?

We should thus see concentrated in the Federal Government the power not only to regulate the local affairs of every State, but also to define who should be entitled to the ballot. The Federal Government would no longer be a Government of limited and enumerated powers; and the State Governments would scarcely retain a remnant of the mass of powers so jealously withheld by them when the Constitution was adopted.

I am aware that Mr. Justice Swayne, of the Supreme Court of the United States, in the case of *The United States* v. *Rhodes*, decided in the Circuit Court for the District of Kentucky, has maintained the constitutionality of the Civil Rights Bill, upon a process of reasoning similar to that employed in this case.    But with all my respect for so learned a jurist, his reasoning appears to me to be not only unsupported by authority, but wholly opposed to the fundamental principles on which the Constitution rests.

In the case of *Smith* v. *Moody*, 26 Ind. 299, the constitutionality of this bill was also affirmed.    But the opinion on this point was only *dictum*, inasmuch as the point was not

involved in the case, and it is supported by no process of reasoning.

On the other hand, the Supreme Court of Kentucky, in the case of *Brown* v. *The Commonwealth*, held the Act to be unconstitutional for reasons which appear to me to be conclusive. It will be observed that the Fourteenth Amendment to the Federal Constitution had not been proclaimed as adopted at the date of the judgment in this case, and its provisions can therefore have no application to the questions under discussion. It will be time enough to discuss that amendment when it shall come judicially before us.

In my opinion the judgment ought to be reversed.