No. 2,433.

THE PEOPLE OF THE STATE OF CALIFORNIA, Respondents, *v.* JAMES BRADY, Appellant.

Constitutional Construction.—Competency of Witness in State Courts.—The State Legislature has the power to declare who shall be competent to testify, and to regulate the production of evidence in the Courts of the State.

Idem.—Fourteenth Amendment.—Chinese Testimony.—The Fourteenth Amendment to the Constitution of the United States does not conflict with the power of the Legislature in the exercise of its discretion to exclude Chinamen from the right to testify in the State Courts.

The case of *The People* v. *George Washington*, (36 Cal. 658,) reviewed and overruled.

Idem.—Reserved Powers of the State.—To the extent of the powers not granted to the General Government or denied to the States, the power of the State is supreme.

Idem.—The State Government is complete in itself, so far as matters of internal government are concerned, and contains in its own Constitution every necessary safeguard against improper use of its powers, and every protection for individual rights which the people thought necessary.

Idem.—The General Government has no authority to interfere with the means a State may adopt to enforce a law which it had a right to pass.

Idem.—Fourteenth Amendment.—The Fourteenth Amendment to the Federal Constitution was not intended to authorize the Federal Government to supervise the State in the exercise of its undoubted powers.

Idem.—Thirteenth Amendment, Section 1.—The first section of the Thirteenth Amendment, which is a mere limitation upon the powers of the State, was directed to the States in their sovereign capacity as lawmakers, and was not intended to afford relief to individuals unlawfully deprived of their liberty. Its purpose is satisfied when such restraint is rendered illegal.

IDEM.—SECTION 2.—The second section of the Thirteenth Amendment authorizes Congress to pass only such laws as would be appropriate to enforce a limitation on the Legislative power of the State.

IDEM.—It confers upon Congress no power to establish a police system for the internal government of the State, or by its laws to annul the laws of a State, or to control their operation in any way whatever.

IDEM.—LAWS OF A STATE.—CONSTITUTIONALITY OF.—The Constitutionality of the laws of a State must be tried by the language of the Constitution, and not by the laws of Congress.

IDEM.—LIMITATION UPON THE POWER OF THE STATE.—POWER OF CONGRESS. The power to enforce a limitation upon the power of a State, cannot be construed to authorize Congress to enlarge the limitation if necessary to render it effectual.

IDEM.—STATE LAWS.—CONGRESS NO POWER TO NULLIFY.—Congress has not the power to nullify a law of the State, either directly or by preventing its execution.

IDEM.—STATE LAWS, CONSTITUTIONALITY OF.—A State law can be nullified only when unconstitutional; and to determine that question is the province of the judiciary.

APPEAL from the County Court of the City and County of San Francisco.

The defendant appealed.

The other facts are stated in the opinion.

*Hall & Dudley,* for Appellant.

*Jo Hamilton,* Attorney-General, for Respondent.
*Darwin & Murphy,* of Counsel.

The statutes of this State say, "Chinese shall not be witnesses in an action or proceeding wherein a white person is a party." And again: "No Chinese shall be permitted to give evidence in favor of or against any white person." These provisions are in force, unless in whole or in part repealed by a clause in the Fourteenth Amendment to the National Constitution, which provides: "Nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Now, if the denial of the power to testify, found in our statutes, amounts to a denial of an equal State protection, then such denial by our State law is made void by the superior force

of the Fourteenth Amendment.   Or, let us put it this way:
The United States Constitution, in its Fourteenth Amend-
ment, provides that no State shall deny to any person within
its borders any legal protection which it accords to another
—that its laws shall be so impersonal as to afford an equal
protection to each.   Now if our State, by excluding China-
men from testifying in cases where white men are suffered
to do so, deprives them of an equal legal protection, then
such deprivation is in contravention of the higher law—
that of the National Constitution, and should be judicially
disregarded.   The question then to be answered is, whether
a person who is deprived of the power of testifying is less
protected than one, who amid the same surroundings,
enjoys that power.

It is true that there are many cases in which the power of
testifying is neither an object of desire, nor in any sense a
right.   Cases wherein it is but a burden, such are those in
which the witness having no personal concern is summoned
by another to illustrate that other's cause.   But there are
cases in which the dearest interests of the witness are in-
volved, and must stand or not stand as the witness can stand
or not stand in the tribunal which passes upon them.   As
to these I shall insist, that if the law allows one man to be-
come a witness in his own cause, it is an unequal law, and
distributes an unequal protection, unless it allows every
other man the same right.   Were it not for the wonderful
force of human prejudice, no argument would be needed to
establish this proposition.   Certainly to any number of
white men similarly disfavored, the inequality would seem
clear—would arouse the liveliest concern for their rights,
and inflame just and instant resistance.   Suppose one white
man, unaided by other than his own proof could bring
down the law upon his injurer, and thus punish a past and
avert a future aggression, while another must stagger
under repeated aggressions and could only invoke a tardy
redress through the oath of one who might very much hes-
itate to be just and generous enough to incur the odium of
seeming to take his part.   The supposal in the case of white

men would be the strongest argument. Nor is it true, as urged by the objector, that to afford an equal protection by the laws means that the State shall stop in making an equal menace against the criminal, whether his victim be a white or a Chinaman. This the State has done. It means more. It demands that such other laws as shall be passed in aid of the menace, shall also apply equally. The menace may be a flaming sword for the protection of one because he can take and wield it, and it may sleep upon the wall within its sheath as to another, because he has been forbidden to take it down. To have equal protection of the laws, means to have equal protection of all the laws which contribute directly toward it. The State secures that protection by means of, first, a menace against the wrong doer; second, the enactment of means adequate to his discovery and conviction; and, third, the infliction of the menaced penalty. To constitute an equal protection to a Chinaman and white man, there must be an equality in each of these elements that go to afford it; and to deny equality in any one of these is to deny an equal protection. The State must not only utter an equal menace against and inflict an equal pain upon his aggressor, but it must also provide equal facilities and appliances for his conviction.

The deliberating aggressor is dissuaded, not by the menace, but by considerations touching the certainty of its execution. If this certainty is as great in the case of a Chinaman injured by a white man as it is in that of a white man injured by a Chinaman, then the restraining influences of the laws in each case are also equal; and if this certainty be not as great in the case of the Chinaman, then the protection afforded him is not that equal protection demanded by the Fourteenth Amendment. If a man is kept at a disadvantage in the means of conviction, he cannot make equal avail either of the menace or its infliction. For *his* protection the menace bears less intimidation and its infliction a diminished assurance.

Equality of protection, demanding equality in the means of conviction, therefore, also demands that whether a Chi-

naman or a white man be concerned, the modes of judicial investigation shall be the same. There shall be an equal right to the same instruments of proof; the same power to compel their attendance; the same sanctions to insure their veracity; the same right for the party concerned, if he be cognizant of the facts to put himself and his oath into th judicial balance.

It is true, that when the law shall have announced equal opportunities in each of these means of self-protection, individual and national likings and loathings will yet, nevertheless, advance the conviction in one case and retard it in another, and an equality of protection will not be exactly attained. But this failure will not be the fault of the law. The State will have done its duty. The law will have ceased to lend its support to the unfair denial. And until the law shall have done that, it will stand in conflict with the National Constitution. The natural consequence of the excluding law is, that more crimes against Chinamen than against white men go unwhipped of justice. The menace of the law is void, so far as regards all those injuries of which some friendly white man is not also cognizant. If a white man having malice enough, have also sufficient prescience, he may strike a Chinaman with every crime in the statute, without legal risk. True, a white man may also be struck at under conditions precluding discovery. But in his case the impunity is accidental—is in spite of the law, and no law could prevent it. While in the case of a Chinaman, if not suggested by, it flows from, a defect in the law. The law does not equally mean to prevent it. It does not intend an equal protection. Let us emphasize the statement that there can be no equal protection unless there be equal facilities in making the legal menace productive of it; an equal power of pointing out the criminal, and of charging home his guilt. The Chinaman is mainly at the mercy of another for such protection as he receives from the laws. The white man bears about with him his own protection. He cannot get beyond the reach of it. He is everywhere attended by a power which intimidates aggression by the menace of dis-

covery. He himself is the accredited messenger of the State to bear to its tribunals the story of his own wrongs, and may become their swift-winged avenger.

If it be conceded then, that one, denied the power of testifying against his aggressor, is less protected that one permitted to do so, it must also be conceded that the law of the State, which allows the white man to bear witness against his aggressor and denies a Chinaman the same right, in doing so, comes in conflict with the National Constitution, and to that extent is discharged of its force and becomes void. And our statutory exclusion of Chinamen in this sort of a case, should be legally held for nought; and in all those cases where white men may protect life or liberty or property by their own testimony, Chinamen should enjoy the same right.

It is objected that to be protected is a right, but to be a witness is not a right, but a privilege, which the State may confer or not.

1st. If to be protected be a right, then to be a witness is also a right, if being a witness be necessary to protection.

2d. To be a witness generally, may be a privilege or rather a duty which the officer conducting the prosecution may impose or not, in his discretion, under the law; but to be a witness in case of injury to one's self, against the aggressor, is not subject to such discretion, but a legal right of the injured party, if he claim to exercise it. Section 1416, Hittell's Digest, makes the injured party competent, and I claim, confers the right to enjoy the competency. Sections 1694 and 2195, the only ones on accusations or complaints, and Section 1740, seem to sustain this view.

But, no matter how that may be, it is practically true that whatever discretion the State Attorney possesses, he commonly uses it in favor of obtaining all the testimony he can, including that of the injured party, and that while he can, with or without right, decline to use a white party injured, he cannot in that discretion use a Chinaman, if a white man be the aggressor. So that even the presumed discretion does not help the objector's case; for that dis-

cretion does not and cannot operate an equal protection. The deliberating aggressor, who agrees with the objector as to this discretion knows, at most, that the prosecutor, in an unusual exercise of power, may decline to testify the sufferer, even though a white man; but he also knows that the prosecutor cannot, in any contingency, testify him if a Chinaman. The fact remains, that in one case the injured party may be used, and in the other he cannot; and if power to testify is power to protect, there is higher protection where it may be, than where it cannot be exercised.

Again, it is argued that as those of our criminal laws which prohibit, are impersonal and general, that is all that is required by the amendment.

I have said that the mere utterance of a prohibition under a penalty, is but a small part of the legal machinery used in protecting from crime, and all that machinery must be applied, as well to the protection of the Chinaman, as to that of the white man, else he has not equal protection. Suppose, while the menace of the law against robbery stood as now, it was declared that a Chinaman should not accuse, nor make complaint, nor have warrant, nor subpena, nor his witnesses sworn, nor the aid of an officer, nor of the State's Attorney. That the defendant should not be convicted save on the testimony of a dozen witnesses, nor even put upon his defence if he denied the accusation on oath. That, in case of his conviction, his punishment should be much smaller than if he had injured a white man. There are none but in such a case would see that the Chinaman had not equal protection, and also see that the protection does not come from the menace, but from the combined group of laws which bring it down upon the spoiler.

But among the group of protective laws—protective because conducing to conviction—there is none of so much direct value as that suffering the party injured to be a witness.

But the objector says, the testimony of the injured party does not secure conviction. and so is no sure protection. It

often does; it often aids it; is often the sole testimony to a technical point, which point has been made morally certain, but not been legally proved by other testimony.   But it always tends, *a priori*, to make the conviction more likely, and so is a dissuading element in the mind of him who deliberates a crime.   He can more safely strike a man legally dumb than one legally voiceful, and he prefers the former as a victim.   The accident of non-punishment will always be possible, but in the one case it is reduced to a minimum, and in the other not.   Only where this accident in both classes of cases possesses the same legal likelihood, will the protection be equal.

But the Chinaman would not be believed, for the law is only a popular conception of his unveracity, which would guide the jury were the law repealed.

Answer:  The law is not a popular expression of his unveracity, as much as of our prejudice.   If we held him unworthy of belief, we would not admit him as a witness in any case; but we do so when another Chinaman is concerned, and holding him credible when a Chinaman is concerned, we can only exclude him when a white man is, on the ground of prejudice.   We really let him tell the truth, in case it hurts only a Chinaman, but not if it hurts a white man.   To hold him capable of truly presenting his observations, in case of a Chinaman as actor and not in case of a white man, is an absurdity which can only be explained by prejudice.

The fact may be and probably is, that the Chinese, as a race, are not as credible as the whites, as a race.   But there is no race absolutely credible, and their lower grade of credibility is no reason for refusing the degree they possess. Then again, it is not the race, but an individual, that testifies, and we can apply to him, of whatsoever race, the same *experimentum crucis*, the same methods of verification we do in the case of a white witness.   Credence is no more compulsory in the one than in the other case.   Indeed, prejudice apart, the laws of belief are quite independent of person, and dependent only on logic and conformity with known truths, and are the same in all cases.

Some white men, not generally credible, are believed, in the particular case, because undoubted truths indorse them; we test their testimony by fixed canons and established likelihoods; we doubt or disbelieve in the case of disconformity. Submit the Chinaman to the same tests; the unveracious Chinaman is no more likely than the unveracious white man to steal away our faculties or misdirect our judgment.

But these considerations are rather on the reason of the law excluding, than to the effect of the amendment; and the logical answer is that, if the Chinaman testify, he may be more or less believed, and that chance of being believed, no matter how small, is a chance which might to that extent augment his protection by augmenting the risk of injuring him with impunity. If he is denied the value of that chance, be it ever so small, he has not as much protection as the white man who enjoys the chance. The law which denies him ever so small a chance of protecting himself by his testimony, protects him less than it does the white man, to whom it accords the chance denied to him. It denies him thereby an equal protection.

The case of *People* v. *Washington*, (36 Cal. p. 658), was decided on the strength of the Civil Rights bill, but it decided a point or two which go in support of my argument. It decided (before the Fourteenth Amendment) that a white man in this State had the security of not being testified against by a Chinaman, and that the negro had the same right by virtue of the Civil Rights bill. Now, if exemption from being testified against be a security, or protection, capacity to testify in one's own behalf is also a security or protection. For testimony is decided to be a power to help or hurt, and its denial is the denial of a security or protection. Again, the Civil Rights bill guaranteed to negroes "the full and equal benefit of all laws and proceedings for the security of person," etc., and the Court, (in 36 Cal. 667,) said, "that in order to secure this, the rules of evidence must apply equally to all alike." Again, (on page 670,) the Court say: "The statutes of the State, regulating the competency of witnesses, are made applicable to all alike."

Now, if this all follows from the terms of the Civil Rights bill, it quite as strenuously follows from those of the Fourteenth Amendment.

While citing this Washington case, I will add, that while we conceive the case in hand securely anchored on the Fourteenth Amendment, we yet, in the spirit of the suggestions of that case, urge that we are also sustained, and the Chinaman's admissibility is supported by Sections 1, 11, and 17, of our own State Constitution. (See Cooley, Const. Lim., p. 355 and note, and pp. 392, 393, 369; *James* v. *Reynolds,* 2 Texas, 251; 2 Yerger, 269, 554; 44 Barb. 472; Cooley, pp. 368, 369.)

'TEMPLE, J., delivered the opinion of the Court, WALLACE, J., and SPRAGUE, J., concurring:

The defendant, a white man, was convicted of the crime of robbery, committed upon Hing Kee, a Chinaman, who was permitted to testify against the defendant on the trial

The ruling of the Court admitting this testimony against the defendant's objections is assigned as error, and is the only question raised on this appeal.

Section 14 of the Act of this State concerning crimes and punishments, as amended in 1863, reads as follows: " No Indian or person having one half or more Indian blood, or Mongolian or Chinese, shall be permitted to give evidence in favor of, or against, any white man."

This section is in full force, unless it is rendered inoperative in whole or in part by a clause in the Fourteenth Amendment to the Federal Constitution, which amendment, so far as material to this inquiry, reads as follows: " All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. Nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any within its jurisdiction the equal protection of the laws."

It is claimed that the statute which denies to the China-man the right to testify against a white man is in conflict with this amendment, because it deprives the Chinaman of some degree of legal protection which it accords to the white man.    That is to say, the ability to testify is a protection, because it tends to deter from crime against the person, by adding to the probability of conviction and punishment.

It is not charged that the law discriminates against the Chinaman, in affording a remedy to the white man for an injury, which upon the same state of facts is not afforded to the Chinaman.    The facts being proven, the law pronounces the same judgment upon one as upon the other.    The same facts being made to appear, the law provides for the China-man the same protection against threatened violence as for the white man.    The protection of the whole police power of the State is afforded to them under the same circumstan-ces, in the same way, and on precisely the same terms as to any other class of inhabitants.    If a crime be committed against the person or property of a Chinaman, the same punishment is meted out to the criminal, when convicted, as though the crime had been committed upon a white man. But not only do the same consequences follow upon the same state of facts being proven, whether they affect Chi-nese or white men, but the law affords the Chinaman every means of bringing the facts to the knowledge of the Court for judicial action that is afforded to the white man.    If a Chinaman be robbed, the commission of the crime may be proven by the same means as though he were a white man. If a white man be robbed by a white man, the fact cannot be established by Chinese testimony; and yet it may fre-quently happen that the fact cannot be proven in any other way.    The same is true of a robbery committed upon a Chi-naman by a white man.    If a white man be robbed by a Chinaman, the fact may be proven by the evidence of white men or Chinese; and this is true as to a robbery committed upon a Chinaman by a Chinaman.

It is plain, therefore, that a crime is punished in the same way and may be proven by the same means in all cases

whether a white man or a Chinaman be the injured party. But it is said that if the general disqualification of Chinese to testify for or against a white man prevents them from testifying when a crime is committed upon them, the law is to that extent unequal and therefore void; that the right of the injured party to testify stands upon a very different footing from the right to call other witnesses. He may have a right to the use of the same species of evidence, but if he be the party concerned, he should also have the same right to offer himself as a witness. A crime may be committed · under such circumstances that the party against whom it is committed is the only person by whom it can be proven. If the injured party be a white man, his testimony alone may be sufficient to cause the punishment of the wrongdoer, and by punishing a past wrong prevent a future wrong, and the Chinaman not being able to do this, is less protected. That although the law threatens the same punishment for a crime committed upon the person of a Chinaman as when committed upon the person of a white man, the certainty of the punishment, and therefore the amount of protection afforded, is necessarily lessened by his exclusion as a witness.

I confess myself unable to see the force of this position, notwithstanding the confidence with which it is relied upon by the ingenious counsel who has made an interesting and able argument in the case on the part of the people. The white man is not permitted to testify because he is the injured party, but because he is a competent witness on other grounds. The Chinaman is not excluded because he is the injured party and also a Chinaman, but because on other grounds he is an incompetent witness. The fact that he is the injured party is an immaterial circumstance in this discussion. His disadvantage is one shared, in a greater or lesser degree, by all who are so circumstanced as not to be surrounded by persons competent to testify. The fact that his countrymen, who are more likely to be his associates, are excluded, may be said to have an effect, in some degree, in the same direction. But this is not owing to the inequality of the law. That affords to all the same instruments of

proof. All general laws operate more or less unequally—not on account of the partial provisions of the law, but from the various circumstances in which those upon whom they operate are placed. The white man who employs Chinese as workmen upon his estate, is less likely to be able to prove offenses against his property than one who employs other laborers. He may, therefore, be said to be less protected; but this is the accident of his circumstances, and not the partiality of the law. He happens to be isolated from those who are competent to testify.

But it is contended that, although another may be so circumstanced as to be deprived of the equal protection of the laws, this is always accidental and not the necessary consequences of the provisions of law.

As to them the law is impersonal, and deprives them of no advantages afforded to others under the same circumstances; but the law excludes Mongolians, as a class, and itself creates the circumstance which places them at a disadvantage.

I think I have shown that there is no difference in principle—that the law does not cause them to be isolated from those competent to testify, although the fact of their exclusion may increase the chances that they will be so isolated. But if the position be admitted then the question resolves itself into this: Has the Legislature the power to declare classes of persons such as Indians and Mongolians incompetent to testify? That it may rightfully do so independently of the Fourteenth Amendment cannot be questioned. The Legislature of every State in the Union, so far as I know, and certainly of nearly every one, has continuously asserted and exercised this power during its entire history. To declare who shall be competent to testify and to regulate the production of evidence has always been considered a proper exercise of legislative power. It has excluded persons for nonconformity of religious belief, for inability to understand the nature of an oath, for having been convicted of an infamous crime, for having negro blood, for being an Indian or a Mongolian, and I am

not aware that the power of the Legislature to pass such laws as ever been questioned.

Now, in passing these laws, the Legislature does not act arbitrarily. It does not exclude a person because of his unbelief in popular theogical dogmas, nor the Mongolian for being a Mongolian merely. The theory of the law and the idea upon which these laws are based is, that every person shall be permitted to testify who can aid the Court in coming to a correct conclusion as to the facts upon which it is to adjudicate. The reason why the testimony of such persons would be valueless in judicial investigations may be that they are incapable of testifying intelligently; that they are too unreliable to be of any service; that their admission would probably defeat justice by producing false testimony, or that they have particular prejudices against certain classes which would cause their evidence likely to do harm where the rights of such persons are concerned; such evidence, it is presumed, would impede rather than advance the cause of justice. It would not tend to protect any, but might cause the conviction of the innocent, or the acquittal of the guilty. Could counsel be convinced that Chinese testimony could never have any weight, or that it would be more likely to cause the escape of the guilty than their punishment, and as likely to cause the conviction of the innocent as the guilty, he would not think their exclusion deprived them of any degree of protection to which they are fairly entitled; and yet this is what the Legislature have decided, and had a right to decide, in enacting the law. I am not called upon to defend such legislation, or to deny that a more reasonable rule would be to allow the Courts to seek information from such sources as may be available, and to give to testimony such weight as it may deem it entitled to. The power of the Legislature to pass such laws is too well established to be called in question at this late day. (*Duffy* v. *Hobson*, October Term, 1870.)

If I am correct in the proposition that this is a proper subject to be regulated by legislative action, and that the

ground upon which the Legislature acts is that such evidence could not aid the Courts in their investigations, but would tend to defeat rather than promote the ends of justice, then it seems to me it must follow that the Fourteenth Amendment to the Federal Constitution can have no bearing upon the subject. It cannot be intended to compel the Courts to occupy their time in listening to evidence which cannot influence their judgment, or to deprive the State of the power to make such regulations as the cause of justice may absolutely require.

I am not called upon to say what should be the ruling if it were to appear that, under the pretense of regulating the production of evidence, the State has really deprived any person within its jurisdiction of any substantial means of protection afforded to others by its laws. There is no reason to suppose that the law in question was not passed in good faith, and with the honest purpose of promoting the cause of justice, even if that could be called in question here. The relation between the States and the Federal Government would forbid any such suspicion upon the motives of a State Legislature on the part of the Federal Government, and certainly this Court, a co-ordinate branch of the Government, cannot impugn their motives. And, independently of the comity which should exist between the departments of the Government, we can hardly conceive *it* possible that a legislative body in a Christian country would deliberately deprive its Courts and police of any proper means for the detection and prevention of crime; that it would willingly leave any class unprotected, so far as the commission of crimes against them are concerned; this would directly encourage crime, and lead inevitably to the demoralization of society, and consequently the insecurity of all. To withdraw from any class the protection of the police laws, through prejudice or from a desire to discourage their presence, would be inhuman and barbarous. We cannot attribute any such motives to a co-ordinate department of the Government, and we must conclude that the provisions of the law under consideration were suppos-

ed by the Legislature to provide every means for the detection and punishment of crime consistent with justice and the safety of the community.

At the time the amendment was adopted similar laws existed in nearly every State of the Union. They had never been regarded as depriving any one of any degree of protection which the law afforded to others, or depriving the Courts of any proper assistance they could otherwise have had in their investigations. They were sustained on the ground that they were necessary that the guilty might be punished and the innocent escape. The amendment did not render such laws less appropriate or less necessary, and there is nothing in the principle established by it which conflicts with the theory of such laws. It cannot be supposed, therefore, that in adopting the amendment it was intended to deprive the State Legislature of their power over the subject.

I think I have shown that there is no inequality in the protective laws of this State; that the law interposes the same shield for the protection of the Chinaman as for the white man, and that it imposes the same punishment when he has been injured; that upon the same facts it pronounces the same judgment, without regard to the person upon whom it may fall; that it dispenses equal justice to all; and further, that in the rules of evidence established by the Legislature there is no inequality, or, if there is, it is made in furtherance of justice, and is unavoidable; that in excluding Chinamen the Legislature exercises a discretion properly entrusted to it, and that a proper exercise of it in the interests of justice, although it may exclude a Chinaman where another is allowed to testify, is not a violation of the Fourteenth Amendment. I cannot think, however, that this last inquiry was necessary in this case. The inquiry should stop when it is ascertained that upon the same state of facts the same legal consequences follow to all. If the laws themselves are equal, imposing the same burdens upon and affording the same remedies to all, under the same ascertained circumstances, the requirement of equality is satisfied.

Limitations upon the powers of the State Governments are appropriate in the Federal Constitution. It may be necessary to restrain the powers of the State that it may not interfere with the General Government in the exercise of the powers granted to it, or that a State may not, by its individual action, defeat any of the purposes for which the General Government exists. To the extent, however, of the powers not granted to the General Government or denied to the States, the power of the State is supreme. It enacts laws of its own right and should be allowed to execute them in its own way. The Federal Government cannot supervise its exercise of the powers it undoubtedly possesses. It is no part of purpose for which that Government was created, to stand guard over the States to see that they execute their laws in a manner not to oppress those who are subject to them. The State Government is complete in itself, so far as matters of internal government are concerned, and contains in its own Constitution every necessary safeguard against improper use of its powers, and every protection to individual rights, which the people thought necessary.

Rules of evidence are a part of the contrivance by means of which the State executes its laws. They are always the means to an end, and if the law be one the State has a right to pass, I cannot think it was intended to interfere with the means the State may adopt to enforce it.

This view is sustained by a consideration of the particular purpose the amendment was designed to accomplish. Its chief purpose undoubtedly was to protect negroes in those States where slavery recently existed. Under those laws it sometimes happened that the law pronounced a different judgment upon a negro from that it pronounced upon a white man upon the same state of facts. The law provided a different punishment to the negro when convicted of crime from that which was provided for a white man when convicted of the same crime, and in other respects the law discriminated against the negro. The amendment was evidently intended to prevent these inequalities. It could

not have been intended to authorize the Federal Government to supervise the State in the exercise of its undoubted powers. Such a construction would reduce a State to condition of a mere municipality, exercising its meagre powers by sufferance, and render meaningless that clause of the Constitution which recognizes the possession of reserved powers by the States.

The counsel for The People cites the case of *The People v. George Washington* (36 Cal., 658) as supporting his views, and it must be admitted that some of the positions taken in that case are inconsistent with the views I have expressed in this case. That case presented for consideration the constitutionality of the Act of Congress commonly called the Civil Rights bill, and its effect upon the fourteenth section of the Act of this State, concerning crimes and punishments, cited above. The Court decided the Act of Congress constitutional; that it was authorized by the Thirteenth Amendment to the Federal Constitution, which provides that "neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction;" and also in the second section, that Congress may enforce the amendment by appropriate legislation.

I dissent, both from the reasoning used and conclusions arrived at in that case, for the reasons given by Mr. Justice Crockett in his dissenting opinion, and for reasons which will readily suggest themselves from what I have already stated. If I am correct as to the theory upon which legislation concerning the competency of evidence is based, it seems to me it must follow that the positions taken by the Court in that case are wrong. There is one reason why I disapprove of that case, however, which, as it has a direct bearing upon this case and differs a little from positions taken by Judge Crockett in that, and is, withal, an important matter, I propose to state.

It is stated in the opinion of the Court, in that case, that the object of the first section of the Thirteenth Amendment

is not only to abolish slavery, but to deprive Congress and the States of the power to reduce any person within the jurisdiction of the United States to a state of slavery. That is to say, so far as its future operation is concerned it is a mere limitation upon the legislative power of the States and of the United States. That the second section confers upon Congress the power, by appropriate legislation, to secure all persons in the United States in the full enjoyment of that liberty contemplated by the first section; "or, in other words, the Thirteenth Amendment was at least intended to make all men born in the United States, without reference to race or color, equal before the law in respect to *personal liberty*— one of the absolute rights of man—and to give Congres\ power to pass any and all laws necessary and proper to ac complish that end."

The first section is said by the Court, and I think cor rectly, to be simply a limitation upon the power of the State to establish slavery or reduce any one to a state of slavery or involuntary servitude; and I cannot think that the second section which simply empowers Congress to enforce this limitation upon the legislative power of the State, con- fers upon Congress any power to establish a police system for the internal government of the State, or by its laws to annul the laws of a State, or to control their operation in any way whatever.

There is nothing in the language used in the first section of the amendment which can be construed into a grant of power. It is a restriction, and not an enlargement of the powers of the General Government, if it applies to the Gen- eral Government at all. It is a limitation upon the States, depriving them of the power to establish slavery. If it were within the province of the Federal Government to establish a system of police laws for the protection of indi- viduals within the States, the language is inappropriate to confer any power over the subject matter of the section. The apparent purpose of the amendment was not to pre- vent the illegal duress of individuals. It was aimed exclu- sively at the institution of slavery as established by the

laws of the States. It was directed to the States in their sovereign capacity as law-makers, and was not intended to afford relief to individuals *unlawfully* deprived of their liberty. Its purpose is satisfied when such restraint is rendered illegal. The right to personal liberty is secured by the amendment itself, and it is not necessary that Congress should pass laws upon the subject, much less give to any one political rights which may add to their importance and enable them to maintain their state of freedom. This is absolutely secured by the Constitution itself, which renders void all laws for their enslavement. They are not to be armed that they may resist State laws, or given importance that they may influence State legislation.

The second section of the amendment certainly contains no substantive grant of power. It merely authorizes Congress to enforce the amendment by appropriate legislation. Its scope is limited by the first section. That is a mere limitation upon the powers of the States. It authorizes Congress, therefore, to pass such laws as under our system of Government would be appropriate to enforce a limitation upon the legislative power of a State, and no other. It is not an affirmative grant of power before which State legislation must give way, like the power to establish uniform laws upon the subject of bankruptcy. The laws of the State must be tried by the language of the Constitutional inhibition and not by the laws of Congress. The power to enforce a limitation upon the power of a State cannot be construed to authorize Congress to enlarge the limitation if necessary to render it effectual. The State law in question ought, therefore, to have been tested by the language of the Constitution and not by the Civil Rights bill.

Nor is it appropriate legislation for Congress to nullify a law of the State, either directly or by preventing its execution. It could only do so when the law is unconstitutional, and to determine that question is the province of the judiciary. It would compel the people unnecessarily to sustain two police systems—one to execute the laws, and the other to control and, in certain cases, to prevent their exe-

cution. It would interfere with efficiency of the police system of the State, and almost inevitably lead to conflicts between the two governments. The two governments, however, are not antagonistical, either in theory or interest. They are parts of one system, supplementary to each other, together supplying all the governmental wants of the people. They are both under the control of the people, but in their operation should be independent of and, therefore, a check upon each other.

Ever since the Federal Government has been in operation it has been the practice to test the constitutionality of State laws, and enforce the limitations upon the powers of the States by judicial decisions. The claim on the part of the Supreme Court of the United States of the right to pass upon these questions, even when arising in the State Courts, though not always conceded, has been generally acquiesced in. Constitutional limitations, so far as they affect individual rights, have always under our system been enforced by judicial action, and I have no doubt a proper construction of the second section of the Thirteenth Amendment would confine legislation on the part of Congress to laws providing for judicial action in the premises.

But the claim on the part of Congress of the right to interfere with or control the operation of State laws, is utterly repugnant to our system of Government. "The genius and character of the whole Government seem to be," said Chief Justice Marshall, in *Gibbons* v. *Ogden*, (9 Wheaton, 195) "that its action is to be applied to all the external concerns of the nation and to those internal concerns which affect the States generally, but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the Government." The division of powers between the State and Federal Government, and the independence of the States within the sphere of their reserved powers, and their exclusive right of legislation as to most of the objects for which Governments exist, has always been considered the principal

and most valuable safeguard for civil liberty afforded by
our system. The right of local legislation for each Colony
is said by Mr. Madison to have been the fundamental idea
of the Revolution. That the Colonies were with each other
and with Great Britain co-ordinate members of one empire,
under a common executive or sovereign, but not united by
a legislative sovereign. The legislative power was main-
tained to be as complete in each American as in the British
Parliament. (Madison's Virginia Report.)

The States, said Mr. Hamilton, can never lose their pow-
ers, till the whole people of America have lost their liberties.
When the Federal Constitution was formed, no idea was
more fixed than that the States should continue independent
of Federal control as to all reserved powers, which were to
include entire control over all matters exclusively appertain-
ing to a particular State. The Colonies, with their local
Legislatures, had been the nurseries of civil liberty, and to
the States, their legitimate successors, was intrusted the
duty of maintaining it. Chiefly to secure the continued
existence of the States, to uphold and maintain them as
independent States, and *thereby* to secure to the people and
their posterity the blessings of liberty, the Constitution
and the Union were formed.

At that time no writer was more popular with American
statesmen than Montesquieu. From him was derived the
idea of dividing the Government into three departments—
the executive, legislative and judicial—as an essential securi-
ty for the liberties of the people. Another idea advanced
by him, which was very popular at that time, and often quo-
ted, was that small States naturally gravitate to a republican
form of government; larger States to a monarchical, and
vast empires to a despotic government. The first was most
favorable to individual liberty; the last, to national power.
They claimed to have secured the advantages of the first
by assuring the independence of the States, and the last by
establishing the Federal Government as a common agent,
which, in the exercise of certain limited powers, should be
supreme over all.

It was more efficient than the Confederacy it displaced, for it executes its own laws. To it was intrusted the control of the foreign relations of all the States. It could declare war, and, to carry it on, wield the entire military power of the Union. As to all the world, at least, except its own members, it presented us as one nation. Within the sphere of its limited authority it wielded the power of a vast empire with all the efficiency of the most despotic Government, and yet it was supposed that it could not be dangerous to the liberties of the people, for its powers were limited and well defined, and could be used but for a few purposes, and those in which all the States had a common interest. The great mass of governmental powers were still reserved to the States. The absolute right of uncontrolled local legislation upon all subjects most intimately connected with individual rights and most essential to the maintenance of personal liberty was reserved.

The Federal Government was created by the compact of sovereign States, and their continued existence in the uncontrolled exercise of their powers, is an essential element of the system. This is doubtless what Hamilton meant when he said that for the General Government to supersede or destroy the State Governments would be to commit suicide. It rests upon them as the dome rests upon and yet upholds the columns which support it.

We cannot conclude from any doubtful language that it was intended to strike from the Constitution the fundamental idea upon which the Union was constructed—to rob the Government of its crowning glory and most beneficent principle; and had such been its apparent meaning, we ought to be diligent to find out some construction which would be less pernicious in its consequences; we should regard it as we would a law apparently legalizing murder or robbery; we could not conclude such a purpose was intended unless it is expressed in unmistakable language.

In this case, however, we are not forced to any such extremity. The most obvious construction is that which is

Points decided.

most in accord with the principles of our government, and which preserves its beneficent features.

The judgment reversed and a new trial ordered.

By CROCKETT, J., : I concur in the judgment and in the opinion of Justice Temple, except in so far as it dissents from or questions the correctness of certain views expressed by me in the case of *The People* v. *Washington.*

By RHODES, C. J., : I dissent. My views upon the questions involved in this case were to some extent expressed in *People* v. *George Washington* (36 Cal. 658); and I will hereafter, should time permit, more fully state the reasons which lead me to the conclusion that Section 14 of the Act concerning crimes and punishments was abrogated by the Fourteenth Amendment to the Constitution.