Burke, Register, et al., v. Clark, Jr., Mayor, et al.

Before Milner and Mawhinney, JJ., en banc.

*Grover C. Ladner*, for Joseph D. Burke, plaintiff.

*D. Barlow Burke*, for Meredith Hanna, plaintiff.

*Abraham L. Freedman*, city solicitor, and *Robert M. Landis*, first deputy city solicitor, for defendants.

*Eric A. McCouch* and *William Barclay Lex*, for amicus curiæ.

MILNER, J., November 10, 1952.—We are considering plaintiffs' motions for judgment on the pleadings in two separate equity proceedings instituted by the Register of Wills of Philadelphia County and the Prothonotary of Philadelphia County against certain officers of the City of Philadelphia. Both of these cases should be considered together with our opinions filed on November 6, 1952, in the companion cases of Lennox, Sheriff, v. Clark, Jr., Mayor, et al., 87 D. & C. 289, and Meade et al. v. Clark, Jr., Mayor, et al., 87 D. & C. 314. We shall not repeat what we have said in those opinions.

Both individual plaintiffs contend that the city officials are improperly threatening to enforce the personnel and civil service provisions (sections 7-302(1) and A-104) of the Philadelphia Home Rule Charter as to each of them and their employes; that defendants have asserted that plaintiffs' employes come within the terms and operation of the charter as to the provisions prohibiting certain political activities by appointed officers and employes of the city (sections 10-107(3) and 10-107(4)). Plaintiff register of wills additionally alleges that defendant director of finance proposes to delete from the city budget his request for funds to pay a salary for a solicitor because of the contention that such solicitor services under the charter are to be provided only by the law department of the city (sections 4-400(a) and 8-410). Defendants have joined issue by way of answer to the effect that each "plaintiff's office is now a city office, and is subject to all of

the provisions of the Home Rule Charter; that no action by either the [city] council or the [State] legislature is required to make any of the provisions of the Home Rule Charter fully effective as to [each] plaintiff and his office."

We may quickly bypass the extended review made by both plaintiffs in an effort to depict the numerous "State" functions in which they engage as agents for the State.[1] We have sufficiently demonstrated in the Lennox case that plaintiffs and their employes, as held in the case of Carrow v. Philadelphia, 371 Pa. 255 (1952), became city officers and city employes upon the ratification of the so-called City-County Consolidation Amendment to the Constitution (article XIV, sec. 8). It was also held in the Lennox case that the consolidation amendment was not self-executing as to what may be loosely described as "county" functions and what we stated there as to the right of a former county officer to the services of a solicitor is applicable to the register's case and sufficiently disposes of that aspect of the case before us.

It is essential that it be understood at the outset that the two cases we are considering are identical in every respect, *except one*, to the county cases disposed of by the Lennox case. In the Lennox case, predicated upon the Carrow case, it was held that civil service and personnel provisions, including a ban upon political activity by employes, in relation to the city's employes, must be regarded as a proper municipal function; that

---

1. In the Lennox case we drew a line of demarcation between the *municipal* powers and functions and *county* powers and functions which are performed by the former county officers who are now city officers. We did not accept either contention advanced by the parties that the charter was either entirely applicable or entirely inapplicable. Following the Lennox case these cases present a new issue as we shall hereinafter set forth. In fairness to counsel for the parties we may say that they have not had an opportunity to consider the questions as we now phrase them in the light of the Lennox case, nor have they had the opportunity to submit their views on such questions in their arguments and briefs.

such charter provisions operated immediately without the necessity for further "enabling" legislation because the consolidation amendment itself converted the former county employes into city employes. In the instant cases both the prothonotary and the register are designated in article XIV, sec. 1, of the Constitution as county officers and upon the adoption of the City-County Consolidation Amendment they became city officers and their employes became city employes. Is there anything then which takes some or all of the employes of either or both of these city officers out of the scope of the operation of the charter's personnel and civil service and allied provisions? In reviewing the five cases disposed of by the Lennox opinion it will be noted that in none of them was there any reliance upon any constitutional grant of power, but both the register and prothonotary lay claim to constitutional powers which defendants must demonstrate to be now superseded or repealed. If the powers granted to the register and prothonotary to select and dismiss their employes were contained in legislative enactments there would be no difficulty in arriving at the same conclusion we reached in the Lennox case.

In the Lennox case, following the Carrow case, it was held, by necessary implication, that any statutes purporting to relate to former county employes by conferring any powers of appointment (and removal) upon the former county officers were either impliedly repealed by the consolidation amendment or were inapplicable by reason of the fact that the charter, authorized by the First Class City Home Rule Act, contained provisions in conflict with such *statutes within the sphere of municipal functions*. By the clear provision of section 11 of the Home Rule Act (53 PS §3421.11), it is provided that insofar as any charter provision, "consistent with the grant of powers and limitations, restrictions and regulations hereafter prescribed" is in conflict with any *statute* it shall

supersede "all acts or parts of acts, local, special or general, affecting the organization, government and powers of such city." When it was determined that the civil service provisions of the charter were within the scope of municipal functions the statutes relied upon by the former county officers in "the Lennox case" were thereby superseded.

· It should be clear that such rule of charter conflict cannot be operative as to a constitutional provision, not only because section 11 clearly is limited to *legislative* acts, but further because section 17 of the Home Rule Act particularly provided that the city could adopt "a form or system of municipal government and for the exercise of any and all powers *relating to its municipal functions, not inconsistent with the constitution . . . of this state.*" [2]

It is clear error to assume that the Home Rule Act gave the city the right to exercise a *totality* of power in regard to municipal functions. Though a matter may be undisputedly municipal in nature, as is the determination of the criteria and manner of hiring and discharging city employes, the city may exercise power in regard to such municipal matter only so long as such exercise of power does not conflict with any operative portion of the Constitution.

The office of prothonotary, though named in article XIV, sec. 1, of the Constitution as a county office, is, as to Philadelphia, a constitutional office created by article V, sec. 7, of the Constitution, which has remained unchanged since 1874. Section 7 provides as follows:

"For Philadelphia there shall be one prothonotary's office, and one prothonotary for all said courts, to be appointed by the judges of said courts, and to hold office for three years, subject to removal by a majority of the said judges; *the said prothonotary shall ap-*

---

2. We do not intend to imply that this limitation stated by the legislature was even necessary to the existence of such limitation.

*point such assistants as may be necessary and author-ized by said courts;* and he and his assistants shall receive fixed salaries, to be determined by law and paid by said county; all fees collected in said office, except such as may be by law due to the Commonwealth, shall be paid by the prothonotary into the county treasury. Each court shall have its separate dockets, except the judgment docket which shall contain the judgments and liens of all the said courts, as is or may be directed by law." (Italics supplied.)

Section 22 of article V provides as follows:

"In every county wherein the population shall exceed one hundred and fifty thousand, the General Assembly shall, and in any other county may, establish a separate orphans' court, to consist of one or more judges who shall be learned in the law, which court shall exercise all the jurisdiction and powers now vested in or which may hereafter be conferred upon the orphans' courts, and thereupon the jurisdiction of the judges of the court of common pleas within such county, in orphans' court proceedings, shall cease and determine. *In any county in which a separate orphans' court shall be established, the register of wills shall be clerk of such court and subject to its directions, in all matters pertaining to his office; he may appoint assistant clerks, but only with the consent and approval of said court.* All accounts filed with him as register or as clerk of the said separate orphans' court shall be audited by the court without expense to parties, except where all parties in interest in a pending proceeding shall nominate an auditor whom the court may, in its discretion, appoint. In every county orphans' court shall possess all the powers and jurisdiction of a registers' court, and separate registers' courts are hereby abolished." (Italics supplied.)

The remaining and indeed only question in these cases is whether or not the City-County Consolidation Amendment has, in effect, impliedly repealed sections

7 and 22 of article V, as above quoted, or any part of them, purporting to confer appointive powers upon plaintiff officers. Obviously these sections have not been expressly repealed and we are unable to conclude that the consolidation amendment yielded such a result and are, to the contrary, convinced that these sections remain in full force and effect.

We shall consider the case of the prothonotary first.

We must assume that the framers of the consolidation amendment had before them article V of the Constitution of Pennsylvania. In this article the power to appoint the prothonotary's employes subject to the courts' power to first determine "such employees as may be necessary" was vested exclusively in the prothonotary and such power was embedded in the Constitution, subject to repeal or to change only by the affirmative vote of the electorate of the entire State after legislative approval at two successive sessions. The City-County Consolidation Amendment makes no specific reference to either this section or the entire judiciary article. Where there *was* an intention to partially supersede section 7 of article III of the Constitution, specific reference was made to that section in paragraph 2 of the amendment. Where the applicability of article XV, sec. 1, *was* intended, specific reference was made to that section by paragraph 5 of the amendment.

Where in the consolidation amendment do we find the possibility of implied repeal as to any section of the judiciary article? The first paragraph of the amendment provided for an abolition of county offices and performance by the city of all functions of county government within its area through officers selected in such manner as may be provided by law. There is no conflict between such paragraph and section 7 of article V of the Constitution. The performance of county functions within the Philadelphia area was to

be subject to and within the limitations of all proper legislative acts and likewise was certainly subject to all specific and applicable constitutional limitations or provisions. Paragraphs 2 to 6, inclusive, of the consolidation amendment, contain no elements of conflict with section 8 of article V. We turn then to the last paragraph of the amendment.

Paragraph 7 of the consolidation amendment provides as follows:

"Upon adoption of this Amendment all county officers shall become officers of the City of Philadelphia, and until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, . . . ."

An ambiguity may be deemed to arise from the words "and until the General Assembly shall otherwise provide," which must be read as a modification of the words which follow, "shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided", etc. If by these words the legislature is now authorized to determine the "duties," manner of election or appointment, compensation and organization of all former county officers, including the prothonotary, the result arises that this provision has, at least to that extent, repealed the constitutional provision as to how some of such matters should be governed in relation to the prothonotary. We have carefully studied the precise wording of the amendment and of article V and we do not think it was intended by the amendment to enlarge the power of the General Assembly in relation to the prothonotary. The words "until the General Assembly shall otherwise provide" must be confined

to article XIV of the constitution, dealing with county officers, and do not enlarge the legislature's powers as to matters covered by article V of the Constitution dealing with a different subject matter, the judiciary. As we shall hereafter demonstrate, the fundamental rules of constitutional construction require a reconciliation of this apparent conflict rather than an unforeseen and unsuspected repeal of a part of a different and unreferred to article. All powers conferred upon the General Assembly by the Constitution are subject to such limitations as may appear in the Constitution. The phrase should be read as follows, "and until the General Assembly shall otherwise provide *within the limitations elsewhere set forth in this Constitution.*"

Mr. Chief Justice (then Justice) Horace Stern, in the Carrow case, effectively indicated that the phrase "shall continue to perform their duties" did not have reference to theretofore legislative "powers" of the sheriff to dismiss his employes at will; that there was therefore no necessity to wait for legislative action. Likewise in this case if there were no constitutional definition or distribution of the "power" of appointment the new charter would apply. If, however, the words "until the General Assembly shall otherwise provide" did not even relate to powers exercised, how can they be deemed to repeal a distribution of power in section 7 of article V? If we were to rely on such narrow and technical interpretation of the word "duties" it would be unnecessary to decide at this time just what power was given to the General Assembly to alter the duties, manner of election or appointment, compensation or organization of the prothonotary's office and register's office insofar as the Constitution is concerned. However, the applicable rule of construction proscribes resort to narrow and technical semantic refinements in considering the meaning of constitu-

tional changes of great importance to the people.[3] The issues here involved are of paramount importance not only to the people of Philadelphia but the people of the entire Commonwealth and we will not rely on any such narrow construction in the determination of the intent of the people in adopting this amendment.

Two important values are set in opposition by the ambiguity we are considering. There is the well-known purpose to effectuate to its fullest extent the home-rule powers of the City of Philadelphia. In contrast to this value there is the entire constitutional design for the governance of the judiciary and the specific measures incorporated into the Constitution to assure the independence of the judiciary and its maximum freedom from influence by any other branch or organ of government.

The settled rules of constitutional construction are of great aid in the disposition of this case. In 11 Am. Jur. 663-64, §54, Constitutional Law, it is stated:

"Many troublesome questions of constitutional construction arise in the interpretation of constitutional amendments with reference to the earlier constitutional provisions to which they have been added. *In accordance with the general rule that harmony in constitutional construction should prevail whenever possible, generally an amended Constitution must be read as a whole, as if every part of it had been adopted at the same time and as one law.*[4] A new constitutional

3. The rule is that mere technical rules, or literal construction which would defeat the principles of government or the objects for which a constitution or an amendment thereto was adopted are not to be applied: see, generally, Bain Peanut Company of Texas et al., v. Pinson et al., 282 U. S. 499, 75 L. Ed. 482, 51 S. Ct. 228; Dunn v. Love, 172 Miss. 342, 155 So. 331, 92 A. L. R. 1323; Riley v. Carter, 165 Okla. 262, 25 P. 2d 666, 88 A. L. R. 1018; State v. City of St. Louis (Mo.), 11 S. W. 2d 1010; Platte Valley Public Power & Irrigation Dist. v. Lincoln County, 144 Neb. 584, 14 N. W. 2d 202, 155 A. L. R. 412; Department of Finance v. Dishman, 298 Ky. 545, 183 S. W. 2d 540, 155 A. L. R. 1429.

provision adopted by the people already having well-defined institutions and systems of law should not be construed as intended to abolish the former system, except insofar as the old order is in manifest repugnance to the new Constitution, but such a provision should be read in the light of the former law and existing system. Amendments, however, are usually adopted for the express purpose of making changes in the existing system. Hence, it is very likely that conflict may arise between an amendment and portions of a constitution adopted at an earlier time. In such a case the rule is firmly established that an amendment duly adopted is a part of the Constitution and is to be construed accordingly. It cannot be questioned on the ground that it conflicts with the pre-existing provisions. If there is a real inconsistency, the amendment must prevail because it is the latest expression of the will of the people. In such a case there is no room for the application of the rule as to harmonizing inconsistent provisions. If it covers the same subject as was covered by a previously existing constitutional provision, thereby indicating an intent to substitute it in lieu of the original, the doctrine of implied repeal, though not favored, will be applied and the original provision deemed superseded." (Italics supplied.)

In 16 C. J. S. 67, §26, Constitutional Law, it is stated:

"Repeal of constitutional provisions by implication is not favored, and an amendment should not be construed as effecting any greater innovation on the existing constitution than is reasonably necessary to accomplish the object of its enactment."

---

4. See Badger v. Hoidale, (C.C.A. 8th) 88 F. 2d 208, 109 A. L. R. 798; Bigney v. Secretary of Commonwealth, 301 Mass. 107, 161 N. E. 2d 573, 120 A. L. R. 669. Cf. Cooper v. Lewis, 177 Ga. 229, 170 S. E. 68, 88 A. L. R. 808; State ex rel. Missoula v. Holmes, 100 Mont. 256, 47 P. 2d 624, 100 A. L. R. 581.

340

In 16 C. J. S. 64-65, §23, Constitutional Law, it is stated:

"The presumption and legal intendment is that each and every clause in a written constitution has been inserted for some useful purpose, and courts should avoid a construction which would render any portion of the constitution meaningless. Different sections, amendments, or provisions relating to the same subject, or in pari materia, are to be construed together and read in the light of each other." [5]

These rules of construction have been adverted to with approval in Pennsylvania cases. In Commonwealth v. Harrison, 51 D. & C. 139, 142 (1943), the learned President Judge Hargest stated:

"In construing the Constitution, as well as statutes, courts must give a construction to it so that, if possible, various sections shall be construed together to make a harmonious whole:[6] Weiss v. Ziegler et al., 327 Pa. 100, 104; Long v. Cheltenham Township School Dist., 269 Pa. 472; and we must interpret the words as the people who voted for the Constitution [and amendment] probably understood them: [citing cases]" [7]

---

5. See also 6 R. C. L., sec. 42, Constitutional Law. In the famous case of Marbury v. Madison, 1 Cranch (U. S.) 137, 2 L. Ed. 60 (1803), Chief Justice Marshall stated the rule as follows:

"It cannot be presumed that any clause in the Constitution is intended to be without effect; and therefore such a construction is inadmissible unless the words require it."

6. See also 6 R. C. L., sec. 41, Constitutional Law; Old Wayne Mutual Life Assn. v. McDonough, 204 U. S. 8, 27 Sup. Ct. 236, 51 L. Ed. 345; People v. Metz, 193 N. Y. 148, 85 N. E. 1070.

7. In the cases we do not think that the rule as to popular intendment of meaning is of aid because the language of the amendment is broad and has in reality resulted in an ambiguity. To hazard a guess as to the "intent of the people" would be a device for imposing our will in the guise of stating what "the people" intended. The simple truth is that the people had no intent as to the problem we are considering because the ambiguity was not then perceived. In the circumstance reliance upon traditional rules of construction and principles of interpretation are to be favored.

Following these rules and reading the amended Constitution as a whole, as if every part of it had been adopted at the same time and as one law, viz., reading section 8 of article XIV (the consolidation amendment) together with section 7 of article V, and indeed, reading together each article in its entirety, we are unable to conclude that they are in such conflict that entire phrases are to be deemed canceled out of article V. Considering these sections together it will be noted that the reference to the Prothonotary of Philadelphia is specific and in detail. The familiar rule of constitutional construction is that the specific rules over the general: Buckley v. Holmes et al., 259 Pa. 176 (1917); Philadelphia County v. Commonwealth, 270 Pa. 353 (1921); Commonwealth ex rel., v. Kline et al., 294 Pa. 562 (1929). In Philadelphia County v. Commonwealth, at pages 358-59, Mr. Chief Justice von Moschzisker stated:

"It is well established that, where a conflict exists between a specific constitutional provision, which is unquestionably applicable to a particular case, and certain general provisions, which, were it not for such conflict, might apply, the specific provision will prevail: [citing cases]."

This rule is applicable where a general amendment is adopted without reference to a highly specific provision with which it would otherwise be in conflict. Although an implied repeal of a constitutional provision may result from necessity and the overwhelming context of phraseology and circumstance, a deliberate intention to repeal by implication is not to be ascribed to either the framers or the people ratifying an Amendment.

We have already indicated that the framers of the City-County Consolidation Amendment, *with the entire Constitution of the Commonwealth before them,*

clearly understood that an express reference to article XV, sec. 1, and article III, sec. 1, was required to express and effectuate their intent. They must have determined that in the absence of specific reference a doubt would arise as to whether the amendment authorized the legislature to provide for "county" home rule. The omission of reference to article V, pertaining to the judiciary, is to be regarded as deliberate, not accidental. Neither the framers of the amendment nor the people who ratified it are to be deemed to have intended to alter or repeal any section or portion of a section in the judiciary article, a subject matter entirely different from the subject of county officers. We have not found a single reference in the huge 7-volume Legislative Journal of the 1949 Proceedings of the General Assembly intimating that there was any intention to repeal any part of the judiciary article and no one, to our knowledge, offered such construction in urging the adoption of the Home Rule Charter.

It has been stated that a written constitution should be construed with reference to and in the light of well-recognized and fundamental principles lying back of all constitutions: Commonwealth ex rel. Smillie v. McElwee et al., 327 Pa. 148, 158 (1937). We may fairly state, without engaging in a discussion of the wisdom of the principle, that almost without exception in the States of the United States the principle of "separation of powers" has been regarded as a fundamental tenet of government. In Bailey v. Waters, Auditor General et al., 308 Pa. 309, 313, affg. 16 D. & C. 160 (1932), it was stated by President Judge Hargest, whose opinion was affirmed per curiam, that "it is inherent in our scheme of government that the three departments should be independent of each other and that neither department *should perform functions belonging to the other nor exercise such influence over*

*the persons conducting the affairs of other departments*
as to control their actions." [8]

We are of the opinion that sections 7 and 22 of article V are part of an article referring to an *entire* plan for the distribution of judicial power in this Commonwealth. The people did not in the ratification of the consolidation amendment have before them any problem as to redistribution and redefinition of judicial power; they were considering home rule within, not without, the general constitutional framework of government. The consolidation amendment because of its genuine beneficial purpose and the evils it was designed to remedy is not to be given the effect of a constitutional convention which would have more seriously considered the very basic tenets of government.

We desire to repeat that we are not now concerned with the desirability of any particular exercise of power, nor the question of whether it would be more wisely exercised in one hand than another, nor whether the people were wise or unwise in distributing or fixing power as they did. We are concerned now with a fundamental question of the constitutional boundaries of power and the limits of its exercise by the respective parties. It is therefore irrelevant to consider whether the charter gives the prothonotary a power of rejection of unsuitable candidates; whether appointment of

---

8. In 6 R. C. L., sec. 145, Constitutional Law, it is stated: "It has been said that this principle of the separation of the powers of government is fundamental to the very existence of constitutional government as established in the United States, and it has been referred to as one of the chief merits of the American system of written constitutions. See generally O'Donoghue v. United States, 289 U. S. 516, 53 Sup. Ct. 740, 77 L. Ed. 1356; Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377; People v. Brady, 40 Cal. 198; Norwalk St. Ry. Co.'s Appeal, 69 Conn. 576, 37 A. 1080; State v. Brill, 100 Minn. 499, 111 N. W. 294; Searle v. Yensen, 118 Neb. 835, 226 N. W. 464, 69 A. L. R. 257; Tyson v. Washington County, 78 Neb. 211, 110 N. W. 634; Enterprise v. State, 156 Ore. 623, 69 P. 2d 953.

employes for the judiciary is a judicial or administrative function; whether there is or is not an *actual* infringement on judicial power. The people of the Commonwealth are perfectly competent to determine the constitutional distribution of power—legislative, executive and judicial—as they see fit. The question before us is how *has* the power been distributed and what characterization has already been made as to the nature, i.e., judicial or nonjudicial, of the particular powers we are considering.

Section 7 of article V empowers the Prothonotary of Philadelphia, to "appoint such assistants as may be necessary and authorized by [the common pleas] courts." This power to appoint cannot be interfered with by the personnel and civil service provision of the Home Rule Charter. Likewise the implied power of removal is, by familiar and settled principles, vested, without limitation, in the prothonotary alone. No other authority is competent to determine for the prothonotary the causes of removal or to require of him the exercise of his power for stated causes. Therefore, the charter, likewise, cannot control him or affect his employes by any prohibition as to engagement in political activities. We may illustrate what we have stated as to the significance of who shall constitutionally exercise the power (without regard to its desirability) by pointing out that the effect of the charter provisions as to political activity has already been accomplished in the prothonotary's office. Rule 981 of the Rules of the Courts of Common Pleas of Philadelphia County, adopted on June 1, 1951, provides:

"No officer or employee of the court or of its prothonotary shall at any time during the term of his office or employment take any active part in partisan politics nor serve as a member of any ward or other political committee."

Likewise, the Municipal Court of Philadelphia,[9] by any order dated December 5, 1949, also banned political activities by employes of that court.[10]

The attempt to enforce the provisions of article X of the charter relating to political activity as to the prothonotary would therefore appear to be a moot question only. However, the location of the power to prescribe the rules of conduct is of major importance. Section 7 of article V of the Constitution confers upon the courts the power to appoint their prothonotary and they may, of course, exercise influence over the prothonotary in the conduct of his office; but it was never intended to give to city council or the city's personnel director the power to exercise such influence as to control the prothonotary in the conduct of his office. The prothonotary is a quasi-judicial officer [11] and his office must be regarded as being part of the judicial department of the government.[12] An exercise of control over his office must have been regarded by the framers of

9. The Prothonotary of the Courts of Common Pleas is also Clerk of the Municipal Court of Philadelphia by virtue of the Act of July 12, 1913, P. L. 711, sec. 4.

10. In 1939 the orphans' court prohibited political activities on the part of its employes.

11. What we have stated is not in conflict with our determination in the Lennox and related cases that the coroner, clerk of quarter sessions, recorder of deeds and sheriff, though they may have quasi-judicial functions, are nevertheless subject to the charter provisions discussed in that case. These offices were deliberately omitted from the judiciary article and the people thereby determined that they were not so essential to the judicial process as to be regarded as a fundamental and incorporated constitutional part thereof.

12. In Com. ex rel. v. Gregg et al., 161 Pa. 582 (1894) it was held that the prothonotary of the Supreme Court is a part of the judicial department; there is no basis for distinction as to the prothonotary of the courts of common pleas.

In Szmahl's Estate, 335 Pa. 89, 92 (1939), it was held that "a register (of wills) is a judge and the admission of a will to probate is a judicial act." Thus a register is likewise a part of the judiciary department aside from his role as clerk of the orphans' court.

article V as an indirect exercise of control over the courts. For example, it may be pointed out that the clerks and assistant clerks of each of the courts of common pleas and the clerks of the various divisions of the municipal court, while they perform their duties for and under the direction of the courts, are employes of and are appointed by the prothonotary, pursuant to his power of appointment as set forth in section 7 of article V of the Constitution. Such power of appointment in the hands of the prothonotary was obviously circumscribed in turn by placing the power to appoint and remove the prothonotary in the courts, thereby effectively assuring a limitation on the prothonotary's power to encroach upon the judicial power. Such power of appointment vested in the city, regardless of suggested limitations, would, in a sense, place the court's own clerk beyond its power. Such result, though certainly valid if the people so ordain by constitutional amendment, is not to be readily implied in the absence of a clear and considered intention to redistribute constitutional power.

What we have already stated in this opinion substantially disposes of the city's contentions in regard to the register of wills, although section 22 of article V does not refer specifically to Philadelphia County, it specifically provides that the register shall be clerk of the orphans' court, subject to its directions in all matters pertaining to his office and further specifically gives him the power to appoint assistant clerks with the consent and approval of the court. This constitutional power of appointment, as we have indicated, has not been repealed by the consolidation amendment.

From what we have stated then, it is apparent that the city's plenary power over municipal functions, under the Home Rule Charter, does not extend to those phases of municipal functions which are governed by subsisting constitutional provisions. Insofar as the Constitution otherwise provides for the appointment,

removal and governance of each of plaintiffs' employes, the charter provisions cannot be operative. We should cautiously add, however, that nothing we have here stated is to be deemed to cover employes of either plaintiff who are not appointed *pursuant* to the appointive powers spelled out in sections 7 and 22 of article V of the Constitution. Insofar as either plaintiff heretofore exercised appointive (and removal) powers pursuant to *legislative* authority, such power no longer exists and the principles set forth in the Carrow and Lennox cases would apply with full force and effect as to the personnel and civil service and allied provisions of the charter.

We shall frame our decree in accordance with our conclusions as set forth above and in accordance with the conclusions heretofore reached in the Lennox and Meade cases, first above cited.

Wherefore we make the following

### Final Decree

And now, November 10, 1952, the decree of this court dated October 31, 1952, having been withdrawn and set aside November 4, 1952, and upon consideration of the pleadings, the parties hereto having agreed that a full and final hearing has been held herein, it is hereby

Ordered, adjudged and decreed that a perpetual injunction issue restraining defendants, their subordinates, agents and employes, and each of them, from in any manner enforcing or attempting to enforce any of the provisions contained in sections 4-400(*a*) and 8-410 of the Philadelphia Home Rule Charter as applying to plaintiff and his office, and from in any manner enforcing or attempting to enforce any of the provisions contained in sections 7-302(1), A-104, 10-107(3) and 10-107(4) of the charter as applying to plaintiff's subordinates, agents, assistants and employes appointed by plaintiff pursuant to the authority con-

tained in section 22 of article V of the Constitution of the Commonwealth of Pennsylvania.

Costs are to be divided between the parties.